**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DAN VALENTINE and W. BRAND BOBOSKY individually, on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs,*<br><br>  v.<br><br>WIDEOPEN WEST, FINANCE, LLC, a Delaware Corporation,<br><br>     *Defendant.* | No. 09 C 7653<br>The Hon. Edmond E. Chang<br><br><br>**Jury Trial Demanded** |

**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, DAN VALENTINE and W. BRAND BOBOSKY, as and for Plaintiffs' class action complaint by and through their attorneys, and demanding trial by jury, allege as follows upon personal knowledge as to themselves and their own acts and observations and, otherwise, upon information and belief based on the investigation of counsel, which Plaintiffs believe further investigation and discovery will support with substantial evidence.

## I.  NATURE OF CASE

1.  WOW provides cable, telephone, and cable broadband Internet services in several states, including Illinois.

2.  Around late 2007, it ran internal tests to evaluate a new type of ISP network device—a special-purpose server appliance made by NebuAd, an Internet ad-serving company.

3.  After testing the new appliance, WOW deployed one or more devices in each of its network facilities.

4.      With this configuration, WOW diverted all its customers' Internet communications to a new path and into the appliance, whether outbound from the customer to a website or inbound from the website to the customer.

5.      WOW captured customers' communications in their entirety, including content such as search terms and page requests for health and financial information, family matters, political interests, religious matters, and travel plans, as well as voice-over-Internet-protocol communications such as Skype.

6.      As WOW continuously funneled customer communications to its collection point and into the appliance, NebuAd continuously accessed and analyzed the communications on the appliance.

7.      NebuAd paid WOW monthly for this ongoing access to WOW's customers' Internet communications.

8.      WOW was not the sender or recipient of the customer communications it intercepted.

9.      Intercepting customer communications was not part of the ISP services WOW provided to customers. Its job was to transmit its customers communications to and from the Internet.[1]

10.      WOW's actions constituted a radical, unexpected, and unusually intrusive activity for an ISP.

11.      When WOW's activities became publicly known, U.S. House and Senate committees and regulatory agencies launched inquiries and hearings directed at WOW, other ISPs that

---

[1] NebuAd, Inc. has settled claims arising out of the operative events alleged in this complaint. *Valentine, et al. v. NebuAd, Inc., et al.*, Order and Final Judgment, Case No. 3:08-cv-05113-THE (N.D. Cal.) (Dkt. No. 251, Dec. 19, 2011).

had implemented the same or similar technologies, and the provider/operators of the technologies, including NebuAd.

12.     Dan Valentine and W. Brand Bobosky were WOW customers whose communications were intercepted by WOW without their consent. On behalf of themselves as well as all others similarly situated (the "Class" and each a "Class Member"), they now seek the relief requested in this class action complaint.

## II.     PARTIES

13.     Plaintiff Dan Valentine ("Valentine") was a resident of Cook County, Illinois, and a WOW broadband services customer during the relevant period, during which he used his home computer and WOW's cable modem and services to access the Internet.

14.     Plaintiff W. Brand Bobosky ("Bobosky") was a resident of Naperville, in DuPage County, Illinois, and a WOW broadband services customer during the relevant period, during which he used his home computer and WOW's cable modem and services to access the Internet.

15.     At all times relevant to this complaint, WideOpen West, Finance, LLC, was a privately owned, Delaware corporation headquartered in Colorado and doing business under names that included "WideOpen West," "WOW! Internet, Cable and Phone," "WOW!", and "WOW" ("Defendant" or "WOW") and was a commercial provider of high-speed, broadband Internet services to an estimated 330,000 customers in and about metropolitan areas of Chicago, Illinois; Evansville, Indiana; Detroit, Michigan; Cleveland, Ohio; and Columbus, Ohio.

## III.     JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action pursuant to Title 28, U.S. Code, Section 1331, arising from the federal cause of action set forth in this complaint.

17.     This Court has subject-matter jurisdiction over this action pursuant to Title 28, U.S. Code, Section 1332, in that the aggregate claims of Plaintiffs and the proposed Class Members exceed the sum or value of $5,000,000.

18.     There is minimal diversity of citizenship between proposed Class Members and Defendant in that Defendant is a Delaware corporation headquartered in Colorado with customers in Illinois, Michigan, Ohio, and Indiana, and Plaintiffs are citizens and residents of the State of Illinois asserting claims on behalf of a proposed class whose members reside in Illinois, Michigan, Ohio, and Indiana.

19.     This Court has personal jurisdiction over Defendant because: (a) Defendant maintains offices and/or facilities in the State of Illinois; (b) a substantial portion of the wrongdoing alleged in this complaint took place in this State, and (c) Defendant is authorized to do business in and has sufficient minimum contacts with this State and/or has otherwise intentionally availed itself of the markets in this State through the promotion, marketing, and sale of its products and/or services in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under Title 28, U.S. Code, Sections 1391(b) and (c), in that Defendant conducts business with consumers in this District, and a substantial portion of the events and conduct giving rise to the violations of law set forth in this complaint took place in this District.

### IV.     CONDUCT COMPLAINED OF

**A.     WOW's Deployment of Appliances in its Networks**

21.     WOW, an Internet services provider (ISP) provided cable-based, broadband Internet services to Plaintiffs and Class Members, who were its customers.

22.    In WOW's capacity providing Internet services to Plaintiffs and Class Members, WOW served as a conduit: Plaintiffs and Class Members, using their computers equipped with WOW-supplied cable modems, transmitted their Internet-bound communications to WOW's network facility, where WOW automatically transmitted the communications to its Internet-facing server.

23.    Communications that Internet-connected parties sent to Plaintiffs and Class Members were routed on the Internet to WOW's Internet-facing server and, from there, were routed through WOW's network facility to the cable models attached Plaintiffs' and Class Members' computers.

24.    Plaintiffs and Class Members, using WOW's Internet services, sent and received e-mail messages, ran searches to locate web content, browsed websites, shopped online, and engaged in Skype phone conversations.

25.    In or about late 2007, WOW entered into an agreement with NebuAd, Inc. ("NebuAd"), a company that served online advertisements.

26.    Under WOW's agreement with NebuAd, WOW licensed and installed one or more NebuAd Ultra-Transparent Appliances (each an "Appliance") in each of Defendant's broadband network facility locations.

27.    NebuAd agreed to pay WOW based on the number of customer accounts, per month, whose communications WOW diverted to the Appliances that WOW installed in its network facilities.

28.    WOW began reconfiguring its broadband network resources and installing Appliances beginning in or about late 2007 or early 2008.

29.     The network facilities in which WOW installed the Appliance included Naper-ville, Illinois, through which WOW provided broadband Internet services to its customers in the Chicago metropolitan area.

30.     To deploy the Appliance, WOW reconfigured the network at each facility: on its Internet-facing server that carried customer communications to and from the "outside world" of the Internet, WOW disconnected the customer data cable. WOW then connected the customer data cable to the NebuAd Appliance. Then, WOW ran a cable to connect the NebuAd Appliance to the Internet-facing server. In other words, WOW installed each Appliance "in-line" in its net-works and funneled customer communications to the Appliance.

31.     In addition to installing Appliances in its reconfigured network facilities, WOW maintained the flow of Plaintiffs' and Class Members' Internet traffic to and from the Appliances and provided ongoing network environment resources and services.

32.     By early March 2008, WOW had reconfigured and incorporated Appliances into all its ISP network facilities.

**B.     Plaintiffs' and Class Members' Internet Communications**

33.     When a user navigates to a web page or clicks on a hyperlink on a web page, the user's request is transmitted in the form of Uniform Resource Locator ("URL") for the particular web page requested by the user.

34.     In addition, the URL does more than just identify a website. It includes path in-formation to identify the specific web page or online document requested by a user. A URL is analogous to identifying a specific book in a library and the particular page, or even section of a page, in that book. For some web pages, the URL relates to sensitive medical, political, religious, cultural, or financial issues, as in the following examples of web page URLs and the title text as-sociated with them:

*http://da.co.la.ca.us/domv.htm*

    LADA Domestic Violence Hotline

*http://www.justice.gov/ust/eo/bapcpa/ccde/CC_Files/CC_Approved
_Agencies_HTML/cc_california/cc_california.htm*

    CC_California [list of credit counseling agencies]

*http://clinicaltrials.gov/ct2/show/NCT00809445*

    Rapid HIV Testing and Counseling – Full Text View – Clinical Trials.gov

*http://www.saintmichaelschurch.org/outreach-service/12step/*

    Twelve Step Meetings | St. Michael's Church

35.    In addition to path information, a URL often includes a "query string." A query string is separated from the URL by a question mark. The query string consists of instructions, such as search terms, telling a website what information to display on the selected web page.

36.    Query strings may contain unencrypted personal, sensitive, or confidential information, as highlighted in the examples below:

*http://www.youtube.com/results?search_query=**it+gets+better**&oq=**it+gets+better**&aq=f&aqi=g10&aql=&gs_l=youtube.3..0l10.7547.13440.0.13772.27.7.12.8.10.0.62.384.7.7.0...0.0.0.*

    Youtube search for *it gets better*

*http://online.wsj.com/search/term.html?KEYWORDS=**voter%20suppression**&mod=DNH_S*

    Wall Street Journal search for *voter suppression*

*http://www.google.com/search?client=safari&rls=en&q=**employment+drug+testing+laws**&ie=UTF-8&oe=UTF-8#hl=en&gs_nf=1&pq=**employment%20drug%20testing%20laws**&cp=10&gs_id=13&xhr=t&q=**criminal+background+check**&pf=p&client=safari&rls=en&sclient=ps y-ab&oq=**criminal**+b&aq=0&aqi=g4&aql=&gs_l=&pbx=1&bav=on.2,or.r_gc.r_pw.r_qf.,cf.osb&fp=b3ad82d2cc338573&biw=1137&bih=768*

    Google search for *employment drug testing laws*
    [query string incorporates search terms from the preceding
    Google search for *criminal background check*]

*http://208.114.97.178:1111/usg/process?**username=01894484DB-SMITH8016
&password=12345**&RLF=http://portal.ICServices.mtnsat.com/err.aspx&
OS=CAFE.SEAMOBILE.COM*

Shipboard login [query string displays unencrypted username/password]

37.　　Query strings include personally identifiable information that users include in their searches. For example, users may check to see what information about them has been posted on the Internet, and so may search on their own names, addresses, or credit card, social security, or unlisted phone numbers. In addition, users often mistakenly enter passwords or other account credentials in web page search fields.

38.　　Even without path and query string information, when a user transmits a request to view a web page, the domain name portion of the request URL constitutes a communication from the user that has substance, purport, and meaning, like the title of a book or name of a magazine; that is why some online ad services engage in contextual ad-targeting, which involves selecting which ad to serve based on inferences drawn from the factors that include identity and characteristics of the particular website the user is visiting.

39.　　In addition, when a user "views" a web page or any other Internet-based document, such as an Adobe Acrobat .pdf file, the act of viewing actually consists of downloading the web page or other document and then displaying it on the user's computer monitor; other file download and upload activities occur when users upload documents (for example, to submit a tax return) or transmit messages with file attachments; the communicative content of many of these files includes the user's personal, personally identifiable, sensitive, and/or confidential information.

40.　　The content of Internet users' communications routinely relates to personal and sensitive matters such as health; financial status and credit; purchases; politics; family, personal

relationships and dating; employment; travel plans; entertainment, such as movie selections; and privileged correspondence, such as marital and attorney-client communications;

41.     The above descriptions of information contained in users' Internet communications apply to and are characteristic of Plaintiffs' and Class Members' Internet activity in which they engaged while using WOW's ISP services during the relevant period for this complaint.

42.     For example, Plaintiff Valentine used his home computer and WOW's ISP services to access the Internet and engage in email correspondence, banking, shopping, filing taxes, monitoring and downloading credit reports, managing health insurance and viewing explanations of benefits, and online payments.

43.     Similarly, Plaintiff Bobosky used his home computer and WOW's ISP services to access the Internet and engage in online activities such as reading online content, shopping, and corresponding with other persons.

44.     Both Plaintiffs consider their Internet communications to be private as between them and the other party with whom they communicate via the Internet.

**C.     WOW's Interception of Plaintiffs' and Class Members' Electronic Communications**

45.     The scope of WOW's wholesale acquisition of Internet traffic and diversion of that traffic to the Appliance encompassed all of Plaintiffs' and Class Members' web navigation activity and other Internet transactions, such as file downloads, inbound and outbound messages using web-based email (*e.g.*, GMail, Hotmail); instant messages; encrypted (HTTPS) communi-cations; and certain voice-over-Internet-protocol conversations, such as those using Skype.

46.     WOW intercepted Plaintiffs' and Class Members' Internet communications as contemplated by WOW in performing its agreement with NebuAd and as called for in that agreement.

47.     WOW intercepted Plaintiffs' and Class Members' Internet communications using the Appliance and resources in WOW's ISP network facilities that it configured to operate with the Appliance for the express purpose of intercepting Plaintiffs' and Class Members' Internet communications.

48.     WOW was paid by NebuAd for intercepting Plaintiffs' and Class Members' Internet communications and disclosing those communications to NebuAd.

49.     Therefore, WOW intentionally and knowingly intercepted Plaintiffs' and Class Members' communications and disclosed Plaintiffs' and Class Members' Internet communications to NebuAd.

50.     WOW's interception of Plaintiffs' and Class Members' Internet communications, and the manner of that interception, were not in the normal course of WOW's business or employment while engaged in any activity that was a necessary incident to the rendition of its services to Plaintiffs and Class Members or to the protection of its rights or property.

51.     Before and since late 2007, engaging in or facilitating online ad delivery has not been the normal course of WOW's business or employment while engaged in any activity that was a necessary incident to the rendition of its services to Plaintiffs and Class Members or to the protection of its rights or property.

52.     WOW's disclosure and uses set forth in paragraphs 99 and 100, below, were not in the normal course of its business or employment while engaged in any activity that was a necessary incident to the rendition of its services to Plaintiffs and Class Members or to the protection of its rights or property.

53.     WOW's interception using its network infrastructure with the Appliance in-line and the activities of certain other ISPs engaging in similar activities were so radical, unexpected,

and intrusive that public disclosure of these activities led to hearings in U.S. House and Senate committees and regulatory inquiries, after which ISPs terminated such activities.

54.     Plaintiffs and Class Members did not receive notice of WOW's interception of their Internet communications during WOW's initial deployment of interception in its Naperville network facility serving the Chicago metropolitan area.

55.     At no time did Plaintiffs and Class Members receive notice of the nature and dimensions of WOW's interception of their Internet communications.

56.     At no time did Plaintiffs and Class Members receive notice of the nature and dimensions of WOW's disclosure of their Internet communications to NebuAd.

57.     At no time did Plaintiffs and Class Members receive notice of the nature and dimensions of WOW's uses of their intercepted communications set forth in paragraphs 99 and 100, below.

58.     WOW did not seek, and Plaintiffs' and Class Members' did not give, any consent commensurate with the nature and scope of the interception of their Internet communications and the subsequent disclosure and use of those intercepted communications, including as set forth in paragraphs 99 and 100, below.

59.     No other party to Plaintiffs' and Class Members' communications gave any consent, or any consent commensurate with the nature and scope of the interception of their Internet communications and the subsequent disclosure and use of those intercepted communications, including as set forth in paragraphs 99 and 100, below.

## V.     CLASS ALLEGATIONS

60.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following Class:

> All WOW Internet services customers whose Internet communications were acquired by WOW through its network facility resources connected to and incorporating a NebuAd Appliance and whose claims are not barred by statutes of limitation.

61.     Plaintiffs reserve the right to revise the Class definition based on facts they learn during discovery.

62.     Excluded from the Class are: (i) any Judge or Magistrate presiding over this action, and the court personnel supporting the Judge or Magistrate presiding over this action, and members of their respective families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which a Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; and (iv) legal representatives, successors, or assigns of any such excluded persons.

63.     *Numerosity*: Individual joinder of all members of the Class is impracticable. The Class includes thousands of individuals. Upon information and belief, Class Members can be identified through the electronic records of Defendant.

64.     *Class Commonality*: Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual Class Members. All Class Members were customers of Defendant during the time that Defendant engaged in the activities alleged in this complaint. All Class Members' Internet communications were diverted, monitored, intercepted, disclosed, divulged, accessed, copied, retained, inspected, analyzed, tampered

with, modified, altered, forged, and/or used by Defendant. Common questions for the Class include:

        a.      the nature of Defendant's ordinary course of business in providing Internet services to customers;

        b.      the scope of Defendant's normal course of employment for activities necessarily incident to providing Internet services to customers;

        c.      Plaintiffs' and Class Members' reasonable expectations regarding Internet services provided by Defendant to its customers;

        d.      the duration of Defendant's operation of network facilities that incorporated operation of the Appliance;

        e.      the locations of Defendant's network facilities that included the Appliance;

        f.      the locations of Defendant's network facilities that served Plaintiffs and Class Members;

        g.      whether Defendant intercepted Plaintiffs' and Class Members' electronic communications;

        h.      the extent to which Defendant's interception of Plaintiffs' and Class Members' electronic communications included the substance, purport, and meaning of the communications;

        i.      whether Defendant reasonably disclosed the interception electronic communications to Plaintiffs and Class Members;

        j.      whether Defendant reasonably disclosed the NebuAd's activities that affected Plaintiffs' and Class Members' electronic communications and computers;

k.     whether Plaintiffs and Class Members actually consented to interception of their electronic communications;

l.     whether Defendant violated Electronic Communications Privacy Act, Title 18 U.S. Code, Section 2510, *et seq*.; and

m.     whether Plaintiffs and Class Members are entitled to the relief requested herein.

65.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison to the numerous common questions that dominate.

66.     The injuries sustained by the Class Members flow, in each instance, from a common nucleus of operative facts. In each case, without authorization, through an ongoing, routinized, and common course of conduct, Defendant deployed the Appliance and caused Class Members' communications to be intercepted; caused Class Members to be monitored, identified, and tracked in their Internet activity; invaded Class Members' privacy; and tampered with their communications and personal computers.

67.     *Typicality*: Plaintiffs' claims are typical of the claims of other members of the Class, as the Plaintiffs and other Class Members were all subjected to Defendant's identical wrongful conduct based upon the same transactions which occurred uniformly in regards to the Plaintiffs and to the Class.

68.     *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of the proposed Class Members' claims. Plaintiffs' interests do not conflict with the interests of the other Class Members that they

14

seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

69.     *Superiority*: The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the proposed Class Members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendant. Furthermore, it would be virtually impossible for the Class Members to seek redress on an individual basis. Even if the Class Members, themselves, could afford such individual litigation, the court system could not.

70.     Individual litigation of the legal and factual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

71.     Given the similar nature of the Class Members' claims, a nationwide class will be easily managed by the Court and the parties.

72.     In the alternative, the Class may be certified because:

a.       the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct by Defendant;

b.       the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be disposi-

tive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede other Class Members' their ability to protect their interests; and

        c.     Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## VI.    CLAIMS FOR RELIEF

73.    Based on the foregoing allegations, which Plaintiffs incorporate as if fully set forth herein, Plaintiffs seek relief under the provisions of Electronic Communications Privacy Act, Title 18 U.S. Code, Section 2510, *et seq*.

### A.    Defendant's Violation of ECPA Wiretap Act Provisions

74.    As an Internet Services Provider ("ISP") providing cable broadband Internet services to the consuming public, including Plaintiffs and Class Members, Defendant was a "provider of an electronic communications service" as defined in Title 18, U.S. Code, Section 2510(15).

75.    Plaintiffs' and Class Members' Internet communications transmitted by Defendant consisted of the transfer of data transmitted in whole or in part by wire, radio, electromagnetic, photoelectronic, or photooptical systems that affected interstate and/or foreign commerce and were therefore "electronic communications" as defined in Title 18, U.S. Code, Section 2510(12).

76.    Plaintiffs and Class Members were persons or entities who used Defendant's electronic communications services, were duly authorized by Defendant to engage in such use, and were therefore "users" as defined in Title 18, U.S. Code, Section 2510(13).

77.    The personal computers of Plaintiffs and Class Members were computers used in and affecting interstate commerce and communication and were therefore "protected computers" as defined in the Computer Fraud and Abuse Act, Title 18, U.S. Code, Section 1030(e)(2).

78.    Defendant's network facility resources together with the Appliance were devices used to acquire the "contents" of communications, as that term is defined in Title 18, U.S. Code, Section 2510(8), in that Defendant used its network facility resources and the Appliance to divert and transfer the substance, purport, and meaning of the communications to the Appliance.

79.    Therefore, Defendant's network facility resources that incorporated the operating Appliance were devices were used to "intercept" the contents of electronic communications, as that term is defined in Title 18, U.S. Code, Section 2510(4).

80.    Defendant's network facility resources that incorporated the operating Appliance were devices and apparatuses that could be and were used to intercept, retain, and transcribe in-transit electronic communications and were therefore "electronic, mechanical, or other device[s]" as defined in Title 18, U.S. Code, Section 2510(5).

81.    Defendant's acts of interception alleged in this complaint exceeded the scope of Defendant's "ordinary course of business" as that phrase is used in Title 18, U.S. Code, Section 2510(5)(a).

82.    Defendant's acts of interception alleged in this complaint exceeded the scope of Defendant's "normal course of [Defendant's] employment while engaged in any activity which is a necessary incident to the rendition of [its] service or to the protection of the rights or property of the provider of that service" as that phrase is used in Title 18, U.S. Code, Section 2511(2)(a)(i).

83.    Defendant's interception of Plaintiffs' and Class Members' Internet communications was intentional.

84.    Neither Defendant nor NebuAd was the originator or recipient of Plaintiffs' and Class Members' Internet communications.

85.     Neither Defendant nor NebuAd was a party to Plaintiffs' and Class Members' Internet communications.

86.     Plaintiffs and Class Members did not consent Defendant's interception of their Internet communications.

87.     Therefore, Defendant's conduct alleged herein violated Title 18, U.S. Code, Section 2511(1)(a) because Defendant intentionally intercepted Plaintiffs' and Class Members' electronic communications.

88.     Therefore, Defendant's conduct alleged herein violated Title 18, U.S. Code, Section 2511(1)(a) because Defendant intentionally intercepted Plaintiffs' and Class Members' electronic communications.

89.     In addition, Defendant's conduct alleged herein violated Title 18, U.S. Code, Section 2511(1)(c) because defendant intentionally disclosed to NebuAd the electronic communications of Plaintiffs and Class Members, which communications Defendant had intercepted, and which Defendant knew and had reason to know were intercepted.

**B.     ECPA Wiretap Act Violations by Defendant and NebuAd**

90.     In the alternative, Plaintiffs allege Defendant and NebuAd acted jointly and severally with the purpose and result of acquiring and using Plaintiffs' and Class Members' electronic communications.

91.     WOW continuously funneled Plaintiffs' and Class Members' Internet communications to its collection point on the Appliance and into the Appliance.

92.     This constituted disclosure to NebuAd, which continuously accessed and analyzed Plaintiffs' and Class Members' communications on the Appliance and uploaded those communications and/or portions and derivatives of them, to its servers.

93. NebuAd used Plaintiffs' and Class Members' communications and/or portions or derivatives of them to serve targeted advertisements to Plaintiffs and Class Members, even when their computers were connected to ISPs other than WOW.

94. In addition, NebuAd used Plaintiffs' and Class Members' communications and/or portions or derivatives of them for marketing analyses that it sold or licensed to other business clients.

95. Defendant's and NebuAd's acquisition and use of Plaintiffs' and Class Members' Internet communications were accomplished through the purposeful, coordinated actions of Defendant and NebuAd, but for which neither Defendant nor NebuAd could have accomplished the interception, disclosure, and uses of Plaintiffs' and Class Members' communications alleged herein, including in paragraphs 99 and 100, below.

96. These coordinated actions included Defendant's reconfiguration of its network equipment, physical integration of the NebuAd Appliances in-line in its networks, activation and continuous operation of the Appliances; and NebuAd's continuous processing of Plaintiffs' and Class Members' communications on the NebuAd Appliances and on its servers.

97. Defendant's and NebuAd's actions set forth in this complaint were undertaken by Defendant and NebuAd in the performance of their respective obligations under an agreement between them.

98. Plaintiffs and Class Members did not consent Defendant's and NebuAd's interception, disclosure, and use of Plaintiffs' and Class Members' Internet communications.

99. Defendant and NebuAd used the intercepted communications to circumvent the privacy and security controls on Plaintiffs' and Class Members' computers so that NebuAd could

continue to monitor and profile them and Defendant could continue to gain revenue from Nebu-Ad.

100.    The particular uses of the intercepted communications included: performing deep-packet inspection to analyze the communicative content of Plaintiffs' and Class Members' Internet communications; altering the content of Plaintiffs' and Class Members' communications to websites and forging the content of web pages being downloaded to Plaintiffs' and Class Members' computers; transmitting code that caused non-standard, undeletable tracking cookies to be installed on Plaintiffs' and Class Members' to circumvent privacy controls on their computers and to persistently and uniquely identify each Plaintiff and Class Member; and engaging in device fingerprinting of Plaintiffs' and Class Members' computers, to circumvent privacy controls on their computers and to persistently and uniquely identify each Plaintiff and Class Member.

101.    The uses of Plaintiffs' and Class Members' communications alleged in paragraphs 99 and 100, above, required continuing and coordinated action by Defendant's and NebuAd.

102.    Plaintiffs and Class Members did not receive notice of the conduct alleged in paragraphs 99 and 100, above.

103.    The activities set forth in paragraphs 99 and 100, above, were so technically novel and complex, so contrary to standard industry practices, and so shocking to the conscience that Plaintiffs and Class Members could not reasonably have consented to Defendant's and NebuAd's uses of Plaintiffs' and Class Members' intercepted communications alleged in paragraphs 99 and 100, above or any interception or disclosure that preceded those uses.

104.    The activities set forth in paragraphs 99 and 100, above, were so technically novel and complex, so contrary to standard industry practices, and so shocking to the conscience that

Plaintiffs and Class Members could not reasonably have understood the nature and scope of those activities without the most robust and explicit notice.

105.    The activities set forth in paragraphs 99 and 100, above, were so technically novel and complex, so contrary to standard industry practices, and so shocking to the conscience that Plaintiffs and Class Members could not reasonably have detected these activities on their own.

106.    The activities set forth in paragraphs 99 and 100, above, were so technically novel and complex, so contrary to standard industry practices, and so shocking to the conscience that Plaintiffs and Class Members had no reasonable means of self-help.

107.    Therefore, Defendant's conduct alleged herein, and including the conduct in which it engaged jointly with NebuAd, violated Title 18, U.S. Code, Section 2511(1)(d), in that Defendant used the contents of Plaintiffs' and Class Members' electronic communications, knowing and having reason to know that the information was obtain through interception in violation of Title 18, U.S. Code Section 2511(1).

**C.    Conclusion**

108.    Through Defendant's interception, disclosure, and use of Plaintiffs' and Class Members' Internet communications, Defendant violated provisions of Title 18, U.S. Code, Section 2510, *et seq.*, causing Plaintiffs and Class Members to be "aggrieved persons" as defined in that statute.

109.    Accordingly, Class Members are entitled to:

a.    such preliminary and other equitable or declaratory relief as may be just and proper;

b.    damages computed as the greater of (i) the sum of the actual damages suffered by Plaintiffs and Class Members plus Defendant's profits made through the violative con-

duct alleged in this complaint; (ii) statutory damages for each Class Member of $100 a day for each day of violation; or (iii) statutory damages of $10,000 per Class Member;

    c.      punitive damages; and

    d.      reasonable attorneys' fees and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following:

(a)      with respect to all counts, declaring the action to be a proper class action and designating Plaintiffs and their counsel as representatives of the Class;

(b)      as applicable to the Class *mutatis mutandis*, awarding injunctive and equitable relief including, *inter alia*:

    (i)      prohibiting Defendant from engaging in the acts alleged above;

    (ii)      requiring Defendant to disgorge all its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate;

    (iii)      awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged in this complaint; and

    (iv)      ordering an accounting and constructive trust imposed on the data, funds, and other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and concealment of such assets by Defendant;

(c)      for a preliminary and permanent injunction restraining Defendant and Defendant's officers, agents, servants, employees, and attorneys, and those in active con-

cert or participation with any of them from engaging in interception without affirmative customer consent except as necessarily incident to the secure and efficient provision of ISP services:

(d)     awarding statutory damages to the Class in an amount to be determined at trial;

(e)     awarding punitive damages to the Class in an amount to be determined at trial;

(f)     awarding attorneys' fees and other litigation costs reasonably incurred;

(g)     awarding pre- and post-judgment interest; and

(h)     granting such other and further preliminary and other equitable or declaratory relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs request trial by jury of all claims that may be so tried.


Dated: May 9, 2012                                  Respectfully submitted,
                                                    KAMBERLAW, LLC

                                            By: _/s/ David A. Stampley_____
                                                    David A. Stampley (*pro hac vice*)
                                                    One of the Attorneys for Plaintiffs, on behalf
                                                    of themselves and all others similarly situated

MICHAEL ASCHENBRENER
mja@aschenbrenerlaw.com
ASCHENBRENER LAW, P.C.
10 South Riverside Plaza, Suite 1800
Chicago, IL 60606
Telephone: 312-462-4922
Facsimile:  312-462-4923

SCOTT A. KAMBER (*pro hac vice*)
skamber@kamberlaw.com
DAVID A. STAMPLEY (*pro hac vice*)
dstampley@kamberlaw.com
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone: (212) 920-3071
Facsimile: (212) 202-6364

JOSEPH H. MALLEY (*pro hac vice*)
malleylaw@gmail.com
LAW OFFICE OF JOSEPH H. MALLEY, P.C.
1045 North Zang Boulevard
Dallas, Texas 75208
Telephone: (214) 943-6100
Facsimile: (214) 943-6170

BRIAN J. PANISH (*pro hac vice*)
panish@psblaw.com
RAHUL RAVIPUDI (*pro hac vice*)
ravipudi@psblaw.com
PANISH, SHEA & BOYLE, LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
Telephone: (310) 477-1700
Facsimile: (310) 477-1699