**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAN VALENTINE and W. BRAND          )
BOBOSKY, individually and on behalf of   )
themselves and all others similarly situated,   )
                                    )
          Plaintiffs,               )          Case No. 09-cv-7653
                                    )
     v.                             )          June 8, 2012
                                    )
WIDEOPEN WEST FINANCE, LLC, a       )
Delaware Corporation,               )          Judge Edmond E. Chang
                                    )
          Defendant.                )
                                    )

## MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT WIDEOPENWEST FINANCE, LLC TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     FACTUAL BACKGROUND ........................................................................................ 2

    A.     Procedural History ...................................................................................... 2

    B.     The Other ISP Actions ................................................................................ 4

    C.     The Parties .................................................................................................. 6

    D.     WOW's Relationship With NebuAd .............................................................. 7

    E.     WOW's Notifications to its Customers Of the NebuAd Roll-Out ....................... 7

II.    APPLICABLE LEGAL STANDARD ............................................................................ 9

III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ELECTRONIC
      COMMUNICATIONS PRIVACY ACT ........................................................................ 11

    A.     Plaintiffs Do Not Allege That WOW Intercepted Any Communication ............ 12

    B.     Plaintiffs Consented To Any Interception Of Their Internet Activity ................ 13

          1.     WOW Provided Plaintiffs With No Fewer than Four Forms of
              Notice Regarding the NebuAd Service.  Plaintiffs Declined to Opt
              Out.......................................................................................... 13

          2.     WOW's Notices and Disclosures Are Virtually Identical To Those
              at Issue in *Kirch*, *Bresnan*, and *Deering* ................................................ 14

IV.    CONCLUSION.......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABN Amro, Inc. v. Capital Int'l Ltd.*,
No. 04-C-3123, 2007 U.S. Dist. LEXIS 19601 (N.D. Ill. Mar. 16, 2007)..............................11

*Amati v. City of Woodstock*,
176 F.3d 952 (7th Cir. 1999) ........................................................................................12, 13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................9

*Brest v. Lewis*,
No. 08 C 4875, 2009 WL 4679649 (N.D. Ill. Dec. 7, 2009) ....................................................9

*Deering v. CenturyTel, Inc.*
No. CV-10-63-BLG, 2011 U.S. Dist. LEXIS 51930 at *2 (D. Mont. May 16, 2011).......10, 12

*Disability Rights Wisc., Inc. v. Walworth County Bd. Of Supervisors*,
522 F.3d 796 (7th Cir. 2008) ........................................................................................9

*E.E.O.C. v. Concentra Health Svcs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ........................................................................................9

*Green v. Cable One, Inc.*
No. 10-cv-0259-RBP, Dkt. No. 68 (N.D. Ala. Feb. 23, 2011) ....................................................4

*In re DoubleClick, Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001)................................................................................7, 12

*In re Toys R Us, Inc. Privacy Litig.*,
No. C 00-2746, 2001 U.S. Dist. LEXIS 16947 (N.D. Cal. Oct. 9, 2001)................................12

*Kirch v. Embarq Mgmt. Co.*,
No. 10-2047-JAR, 2011 U.S. Dist. LEXIS 92701 (D. Kan. Aug. 19, 2011)................... *passim*

*Manard v. Knology, Inc.*,
No. 10-cv-00015-CDL, 2010 U.S. Dist. LEXIS 60629 (M.D. Ga. June 18, 2010)..................5

*Mortensen v. Bresnan Communications*,
No. 10-13-BLG, 2010 U.S. Dist. LEXIS 131419, at *13 (D. Mont. Dec. 13, 2010) ....5, 11, 12

*Steigmann v. Dem. Party of Ill.*,
406 F. Supp. 2d 975 (N.D. Ill. 2005) ............................................................................10, 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Staves*,
   383 F.3d 977 (9th Cir. 2004) ...............................................................15

*Valentine v. NebuAd, Inc.*,
   No. 08-05113, 2009 U.S. Dist. LEXIS 93454 (N.D. Cal. Oct. 5, 2009) ...................................2

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ...............................................................10

**STATUTES**

18 U.S.C. § 2510(4) ...............................................................11

18 U.S.C. § 2510(8) ...............................................................11

18 U.S.C. § 2510 *et seq.*...............................................................1, 11

18 U.S.C. § 2511 ...............................................................11

18 U.S.C. § 2511(1)(a) ...............................................................11

18 U.S.C. § 2511(1)(d) ...............................................................11

18 U.S.C. § 2511(2)(d) ...............................................................12, 14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6)...............................................................9

This is a case about targeted advertising, a commonly used form of Internet marketing that matches consenting users with advertisements tailored to those users' interests, based on an analysis of those users' anonymized web browsing data.  Starting in December 2009, Plaintiff Valentine and his counsel, on their quest for what Judge Shadur called the "pot of gold at the end of the metaphorical rainbow," filed suit against *six* Internet Service Providers who utilized NebuAd,, one of these behavioral advertising services.  The original complaint asserted seven causes of action against Defendant WideOpenWest Finance, LLC ("WOW"), a small cable television operator that also provides Internet services.  Here at the end of the rainbow, there is no gold in sight.  The five other ISP actions have been resolved in the ISPs' favor, and here, Plaintiffs have abandoned six of their original claims, leaving only a claim under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. 2510 *et seq.*  This sole remaining claim fails as a matter of law, and Plaintiffs' complaint must be dismissed.

Plaintiffs are Illinois residents who contracted with WOW to receive Internet service. They agreed to WOW's Terms of Service, which expressly disclosed the use of third-party targeted advertising on the WOW network.  WOW contracted with NebuAd, a third-party targeted advertising company, to provide targeted advertisements to WOW's customers, and WOW and NebuAd installed a device on WOW's network that enabled NebuAd to perform its services.  Prior to its system-wide implementation of the NebuAd device, WOW notified its customers of the upcoming changes in several ways, and gave them an opportunity to opt out. Some did.  Plaintiffs did not, but have filed suit and made a number of misleading accusations. But two critical facts each defeat their claims:  WOW did not intercept the electronic communications at issue, WOWexpressly disclosed its provision of targeted advertising in general and the NebuAd service in particular to Plaintiffs as a condition of WOW's service.

-1-

Plaintiffs' ECPA claim thus fails for two independent reasons. First, Plaintiffs do not allege that WOW ever intercepted – that is, acquired – the contents of any communication processed through NebuAd's device, an omission fatal to any ECPA claim. Rather, Plaintiffs allege that WOW routed users' communications to and from NebuAd's device, and that *NebuAd's* device acquired the contents of those communications. Another district court in one of the related ISP/NebuAd cases has already held that the mere routing of information by an ISP to NebuAd did not constitute an "interception" under the ECPA. *Kirch v. Embarq Mgmt. Co.*, No. 10-2047-JAR, 2011 U.S. Dist. LEXIS 92701, at *20-21 (D. Kan. Aug. 19, 2011). Nor can WOW be secondarily liable for routing the communications to NebuAd. Thus, Plaintiffs cannot maintain a claim against WOW under ECPA.

Second, Plaintiffs consented to the interception of their communications by continuing to use WOW's Internet services after receiving numerous forms of notice. Every sister court to review a similar ECPA claim in one of the other ISP/NebuAd actions discussed above has dismissed it on this basis, and this case warrants the same result. WOW's Terms of Service clearly disclosed that WOW could partner with third-party ad networks who would monitor users' Internet activity to provide targeted advertisements. WOW later provided additional disclosures regarding its specific affiliation with NebuAd and offering an opt-out. By continuing to use WOW's Internet services despite these clear disclosures, Plaintiffs consented to any interception, which is a complete defense to their ECPA claim.

## I.     FACTUAL BACKGROUND

### A.     Procedural History

This case originates from a class-action lawsuit filed by Plaintiff Valentine and others in the Northern District of California in November 2008. *Valentine v. NebuAd, Inc.*, No. 08-05113, 2009 U.S. Dist. LEXIS 93454, at *6 (N.D. Cal. Oct. 5, 2009). The *NebuAd* plaintiffs alleged that

six Internet Service Providers (including WOW) contracted with NebuAd, a company that provided an advertising service that – like Gmail – used anonymous data to provide its customers with more relevant advertisements. *Id.* at *4-5. They claimed, among other things, that NebuAd and the ISPs violated the ECPA by installing hardware at their facilities that "intercepted" and "diverted" their online communications to serve them these advertisements. *Id.* at *6. In October 2009, the ISPs were dismissed for lack of personal jurisdiction. *Id.* at *3.

Plaintiffs' counsel then filed individual actions against each of the six ISPs in various federal courts. In December 2009, the lead plaintiff in *NebuAd*, Dan Valentine, brought this action against WOW, asserting seven claims under federal and Illinois state law, purportedly on behalf of all WOW customers whose Internet traffic was allegedly inspected and/or diverted during a few-month period in 2008 when WOW deployed the advertising service.

This is WOW's third motion to dismiss in this action. The first, filed in February 2010, was denied ***without prejudice***, to allow the Court to "discuss the case in further detail" at a subsequent status hearing. Dkt. No. 42 at 5. The second, filed in April 2011, was denied ***without prejudice*** as moot when the Court stayed the ECPA claim after determining that Plaintiffs' other six claims were subject to arbitration. Dkt. No. 123 at 15. In neither instance did the Court address WOW's argument that Plaintiff Valentine consented to any interception by continuing to use WOW's service after receiving numerous disclosures regarding third-party advertising and WOW's relationship with NebuAd.

In its order compelling arbitration, the Court stayed litigation of the ECPA claim until the resolution of arbitration. *Id.* at 13-14. On April 23, 2012, Plaintiffs announced their intent to abandon the arbitrable claims and to proceed solely on the ECPA claim. Dkt. No. 126. The next day, the Court dismissed the arbitrable claims, ordered Plaintiffs to file an amended complaint,

and granted WOW leave to file a motion to dismiss.  Dkt. No. 127.

Despite having received leave to file (but not having filed) an amended complaint adding a second named plaintiff, on May 9, 2012, Plaintiffs filed a motion for leave to file another amended complaint, representing that the proposed amendments were to "promote efficiency for the Court and all parties . . . in light of additional evidence Plaintiffs have acquired since filing the first complaint and the relevance of that evidence to claims and defenses in this matter."  Dkt. No. 130 ¶¶ 4-5.  In reality, the Second Amended Complaint ("SAC") alleges few new facts.  It does, however, omit numerous quotes from and references to a document – heavily cited in previous versions of the complaint – whose contents conclusively establish Plaintiffs' informed consent: WOW's response to Congressional inquiries regarding WOW's relationship with NebuAd ("WOW RTC").  *See* Dkt. Nos. 1 and 101-1 ¶¶ 4, 14, 16, 24, 26, 29, 30, 39, 47.  After a hearing on the motion, the Court directed Plaintiffs to file the SAC.  Dkt. No. 134.

### B.      The Other ISP Actions[1]

Since WOW filed its first motion to dismiss in this case, ***all*** of the other actions against ISPs filed in the wake of the *NebuAd* action – based on nearly identical allegations, involving the same electronic equipment and the same technology offered by the same third-party company – have been dismissed.  As outlined below, all three courts to review a similar ECPA claim in the ISP/NebuAd actions held that plaintiffs consented to any interception by continuing to use the ISPs' services after receiving disclosures regarding third-party advertising.[2]

---

[1] A chart providing additional detail regarding each of the other ISP actions, along with copies of dispositive orders in each case, is attached as Exhibit A.

[2] The other two cases were disposed of on other grounds.  The court in *Green v. Cable One, Inc.* dismissed on standing grounds because the named plaintiff had not even subscribed to the ISP's Internet service during the relevant period.  No. 10-cv-0259-RBP, Dkt. No. 68 (N.D. Ala. Feb. 23, 2011).  The

(continued...)

In December 2010, the court in *Mortensen v. Bresnan Communications* found consent to the NebuAd service based on three disclosures by Bresnan: (1) its *OnLine Subscriber Agreement*, (2) its *Privacy Notice*, and (3) a link on its website allowing customers to opt out of targeted advertising facilitated by NebuAd. No. 10-13-BLG, 2010 U.S. Dist. LEXIS 131419, at *13 (D. Mont. Dec. 13, 2010). The court noted that both the subscriber agreement and privacy policy made it "evident that Plaintiffs' electronic transmissions would be monitored and would in fact be transferred to third-parties for the purpose of providing 'content or services.'" *Id.* The court also pointed to the specific mention of the NebuAd appliance on Bresnan's website. *Id.* Thus, the court held that plaintiffs "did know of the interception and through their continued use of [the] Internet Service, they gave or acquiesced their consent to such interception." *Id.*

Next, in May 2011, the court in *Deering v. CenturyTel, Inc.* dismissed plaintiff's ECPA claim involving the NebuAd service because he "acquiesced his consent by using CenturyTel's services knowing his Internet activity could be diverted and used to target him with advertisements." No. CV-10-63-BLG, 2011 U.S. Dist. LEXIS 51930 at *2 (D. Mont. May 16, 2011). The *Deering* court considered three CenturyTel disclosures: (1) its Privacy Policy, which noted that user data could be collected and shared for marketing or other services; (2) an email notification of CenturyTel's relationship with NebuAd; and (3) a chance for customers to opt out of NebuAd's targeted advertising. *Id.* at *3-6. The court concluded, "for the reasons stated in *Mortensen* . . . [plaintiff] consented to the monitoring of his Internet activity." *Id.* at *7.

---

(...continued)

court in *Manard v. Knology, Inc.* ordered arbitration on all claims and stayed the litigation pending the outcome of the arbitration. No. 10-cv-00015-CDL, 2010 U.S. Dist. LEXIS 60629 (M.D. Ga. June 18, 2010). On May 2, 2011, shortly after WOW filed its previous motion to dismiss, the *Manard* court entered its final judgment dismissing the case.

The final NebuAd domino fell in August 2011, when the court in *Kirch* dismissed plaintiffs' ECPA claim on two separate grounds on summary judgment. Embarq had elected to forego a motion to dismiss, but the court relied, as did the *Mortensen* and *Deering* courts, on the disclosures provided by Embarq to its subscribers. 2011 U.S. Dist. LEXIS 92701, at *28-29. Although the Embarq disclosure never identified NebuAd as the service provider, the court held it was sufficient that Embarq's privacy policy "informed subscribers that their de-identified data could be shared with third parties," the agreement noted its terms could be changed at any times, and Embarq later revised the agreement to add information about preference advertising, along with an opt-out mechanism. *Id.* Second, the court held that the ISP could not be liable under the ECPA because it did not "intercept" the contents of any communication, as the record showed the ISP "did not acquire any of the information obtained by the NebuAd System." *Id.* at *24.

As set forth more fully below, WOW notified Plaintiffs precisely how information could be shared with third party ad networks and gave subscribers the chance to opt out. Plaintiffs declined to exercise that right, and they cannot now raise an ECPA claim.

### C.   The Parties

WOW is a small cable television operator that also provides bundled high-speed Internet and telephone services to customers in Illinois, Indiana, Michigan, and Ohio. (SAC ¶¶ 1, 15.) Plaintiffs are former WOW customers who, like the approximately 300,000 other WOW high-speed Internet customers in 2008, had an account governed by an initial work order and three related customer service agreements: the Terms and Conditions of Service ("Terms and Conditions"), the Internet Privacy Policy ("Privacy Notice") and Internet Privacy Information Statement ("Privacy Statement") (collectively, the "TOS"). (*See id.* ¶¶ 12-14, WOW RTC at 3.) The TOS are provided in hard copy at the time customer service is initiated and, thereafter, are made widely available through WOW's website. (WOW RTC at 3.)

Customers are regularly reminded to review the TOS in the Terms themselves, as well as through a link on the "Frequently Asked Questions" page in the "Customer Care" section of WOW's website and through reminders in their monthly bills.  (*Id.*)  Each document within the TOS identifies the date it was last revised so that customers are aware of when changes are made.  Plaintiffs, like WOW's other high-speed Internet customers, received and approved WOW's TOS.  *See* Dkt. No. 123 at 3 ("Plaintiffs do not dispute that they agreed to the Terms of Service. . . .").

### D.     WOW's Relationship With NebuAd

In 2007, WOW entered into an agreement with NebuAd, one of many companies offering "behavioral advertising" services.  (*See* SAC ¶ 25; *see also In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 501-5 (S.D.N.Y. 2001).)  These services attempt to increase the success rates of online advertisements by customizing them according to users' preferences.  (*See* WOW RTC at 2.)  WOW tested the NebuAd technology at its facility in Naperville, Illinois for a brief period in December 2007, deployed the NebuAd service to its network in early March 2008, and terminated the agreement on July 8, 2008, taking all NebuAd appliances offline from WOW's network by July 9, 2008.  (*See id.* ¶¶ 29, 32; WOW RTC at 1.)

### E.     WOW's Notifications to its Customers Of the NebuAd Roll-Out

Well before the NebuAd technology was identified or selected for deployment, WOW's TOS specifically provided that as a condition of installation and receipt of service, third-party ad servers and persistent cookies would be utilized:

**Use of Third Party Ad Networks**

WOW ***may allow other companies, called third-party ad servers or ad networks, to display advertisements*** on WOW web pages. Some of these ad networks may place a persistent cookie on your computer. ***Doing this allows the ad network to recognize your computer*** each time they send you an online advertisement. In this way, ad networks may compile information about where

you, or others who are using your computer, saw their advertisements and determine which ads are clicked on. ***This information allows an ad network to deliver targeted advertisements that they believe will be of most interest to you***. WOW does not have access to or control of the cookies that may be placed by the third-party ad servers or ad networks.

(WOW Resp. to Cong, Customer Notifications Summary, at 1 (emphases added).)

The TOS further disclosed that "[a]s part of WOW!'s ongoing efforts to improve the quality of WOW!'s services, WOW! ***or someone acting on its behalf*** may engage in the anonymous monitoring of Internet activity," and offered a link customers could visit to opt out of such tracking.  (*Id.* (emphasis added).)

Then, approximately four weeks prior to deployment of the NebuAd service, WOW provided specific notice of the service in **three** different ways.  First, WOW modified its TOS – the method of communication its users agreed to when they established their Internet service with WOW – to further clarify the use of third-party advertising, including:

- **an enhanced description of how third party ad networks operate** (*e.g.*, "[W]e use an advertising network provider to deliver or facilitate delivery of advertisements to our Customers while they are surfing the web.  These advertisements are based on our Customers' anonymous surfing behavior . . .") (WOW RTC at 2);

- **a specific disclosure of WOW's affiliation with NebuAd** ("We use an advertising network provider, NebuAd, to deliver or facilitate delivery of advertisements to our users while they are surfing the web.  These advertisements are based on users' anonymous surfing behavior while they are online . . . The ad network operates by observing anonymous user activity . . .") (*id.*); and

- **a link customers could visit to opt out of NebuAd's services** ("[I]f you do not want the benefit of online targeted advertising, you may opt out.  You can review additional information about our third party ad network providers and information regarding your ability to opt out by visiting [link].") (*id*. at 3).

WOW also added a "Third Party Advertisers" link to WOW's homepage directing users to information concerning the NebuAd services and the ability to opt out of those services.  (*Id.* at 3.)  Finally, WOW also updated its online FAQ to describe the NebuAd services and the ability of users to opt out of those services.  (*Id.*)

Along with these notifications, WOW's users were provided with **three additional sources of disclosure and notice** in the two-month period following deployment. (*Id.*) First, all users received both email notice and a mailed letter devoted specifically to the NebuAd services, which included opt-out information. (*Id.*) Second, WOW's work orders (the written statements provided to customers at the time of installation or subsequent service) included language directly referring the user to information about tailored Internet advertising, including the right to opt out. (*Id.*) Third, WOW advised customers in all billing statements to review privacy-related terms and conditions and included the link to those terms. (*Id.*)

Based on these notices, approximately 3,000 (or about 1%) of the more than 300,000 WOW subscribers decided to opt out of NebuAd's services, but Plaintiffs never did. (*Id.* at 4.)

## II.     APPLICABLE LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). In other words, it is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'" by providing "more than labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do. . . ." *Id.* at 555 (citations omitted). The facts alleged in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming all those allegations are true. *E.E.O.C. v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*). The Court treats well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Disability Rights Wisc., Inc. v. Walworth County Bd. Of Supervisors*, 522 F.3d 796, 799 (7th Cir. 2008). However, it is not obligated to accept inferences that are supported only by speculation or conjecture. *Brest v. Lewis*, No. 08 C 4875, 2009 WL 4679649, at *2 (N.D. Ill. Dec. 7, 2009).

The Court may consider documents outside the pleadings under at least two circumstances. First, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Second, "a court may consider judicially noticed documents such as historical documents, documents contained in the public record, and reports of administrative bodies." *Steigmann v. Dem. Party of Ill.*, 406 F. Supp. 2d 975, 980 (N.D. Ill. 2005). Under either of these grounds, the Court may consider WOW's Response to Congress (previously filed at Dkt. Nos. 23-1 and 60-1).

First, the contents of WOW's Response to Congress are referred to in Plaintiffs' complaint and are central to their ECPA claim. Plaintiffs' previous two complaints repeatedly cited to and quoted from WOW's Response to Congress, which outlines the disclosures in WOW's TOS and WOW's subsequent disclosures provided to its customers regarding its relationship with NebuAd. *See* Dkt. Nos. 1 and 101-1 ¶¶ 4, 14, 16, 24, 26, 29, 30, 39, 47. Copies of that document were attached to WOW's two previous motions to dismiss. Dkt. Nos. 23-1 and 60-1. Plantiffs' SAC also repeatedly invokes the contents of WOW's Response to Congress by challenging the sufficiency of the notice WOW provided to its customers. (SAC ¶¶ 52, 54-59, 102.) Furthermore, WOW's Response to Congress establishes consent, the absence of which is central to any ECPA claim. Both the *Mortensen* and *Deering* courts considered analogous NebuAd disclosure documents on motions to dismiss for just that reason. *See Mortensen,* 2010 U.S. Dist. LEXIS 131419, at *13; *Deering,* 2011 U.S. Dist. LEXIS 51930 at *7. Ultimately, a plaintiff "cannot get a free pass to get beyond a motion to dismiss by simply failing to attach documents (that he effectively concedes are accurate) to the Complaint where

the Complaint refers to those documents and those documents are central to his claim."

*Steigmann*, 406 F. Supp. 2d at 986. WOW's Response to Congress is such a document.

Second, WOW's Response to Congress is properly subject to judicial notice. The court

may take judicial notice of documents in the public record which are undisputedly authentic.

*ABN Amro, Inc. v. Capital Int'l Ltd.*, No. 04-C-3123, 2007 U.S. Dist. LEXIS 19601, at *25 (N.D.

Ill. Mar. 16, 2007). WOW's Response to Congress was submitted to the public record under

oath and, as evidenced by Plaintiffs' reference to that document by URL, is widely available to

the public. (*See* Dkt. No. 1 ¶ 14; Dkt. No. 101-1 ¶ 14.)

## III.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

Plaintiffs allege that WOW violated §§ 2511(1)(a) and 2511(1)(d) of Title I of the

Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2510 *et seq*. In order to prevail on

such a claim, Plaintiffs must show that WOW: (1) "intentionally intercept[ed]" an electronic

communication under § 2511(1)(a), or "intentionally" and "knowing[ly] uses" the contents of an

intercepted communication under § 2511(1)(d). Both sections require an "interception" that does

not fall under one of the established exceptions, and the customer must not have consented to the

interception. 18 U.S.C. § 2511. The statute defines "interception" as the actual "acquisition of

the contents of any . . . electronic . . . communication through the use of any electronic,

mechanical, or other device." 18 U.S.C. § 2510(4). "Contents" is defined as "the substance,

purport, or meaning of that communication." 18 U.S.C. § 2510(8).

A defendant cannot be held liable under the ECPA if it simply acts as a conduit to and

from an entity that acquires the contents of a communication, but does not itself acquire those

contents. *Kirch,* 2011 U.S. Dist. LEXIS 92701, at *20-21. Nor can a defendant be held

secondarily liable based upon a contractual relationship that allows a third party access to a

network. *Id.* at \*21-24; *see also In re Toys R Us, Inc. Privacy Litig.*, No. C 00-2746, 2001 U.S. Dist. LEXIS 16947 (N.D. Cal. Oct. 9, 2001). Here, Plaintiffs do not allege facts to support a conclusion that WOW itself *ever* acquired or knowingly used the contents of any of their communications.

Moreover, consent is a complete defense to liability. 18 U.S.C. § 2511(2)(d); *DoubleClick*, 154 F. Supp. 2d at 514 n.23. Consent need not be express, but rather may be implied, especially where plaintiffs were notified that their communications were being monitored. *Mortensen*, 2010 U.S. Dist. LEXIS 121419 at \*7; *Deering*, 2011 U.S. Dist. LEXIS 51930, at \*7; *Kirch*, 2011 U.S. Dist. LEXIS 92701, at \*28-29; *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999). Here, WOW widely publicized the delivery of targeted advertisements and the deployment of the NebuAd service, and Plaintiffs consented to receiving that service.

### A.       Plaintiffs Do Not Allege That WOW Intercepted Any Communication.

Although Plaintiffs mirror the statutory language by asserting that WOW "intercepted" communications (SAC ¶¶ 12, 47-50, 53-55) or used the contents of such communications (*id.* ¶ 100), the FAC alleges no facts to support either conclusion. As Plaintiffs correctly observe, as an ISP, "WOW served as a conduit." (*Id.* ¶ 22.) Plaintiffs' SAC distinguishes between the roles played by WOW and NebuAd: WOW "diverted" data to NebuAd, and NebuAd received, "accessed and analyzed" that data. (*Id.* ¶¶ 4, 6.) And all Plaintiffs' factual allegations that discuss the acquisition or use of the contents of communications point squarely to NebuAd. (*See, e.g., id.* ¶¶ 6, 92-94.) Indeed, Plaintiffs *never* allege what is necessary to state a claim under the ECPA: that *WOW* itself ever acquired the contents of Plaintiffs' communications.

The court in *Kirch* dismissed a nearly identical ECPA claim against another ISP related to NebuAd on these grounds. There, the court noted that the ISP merely acted as a conduit,

routing communications to a NebuAd device installed on its network. 2011 U.S. Dist. LEXIS 92701, at *20. The court held that, because the ISP itself did not acquire the contents of any communication, it did not "intercept" any communication, and therefore could not be liable under the ECPA. *Id.* The court further held that the ISP could not be secondarily liable simply for allowing or enabling NebuAd's acquisition of the communications. *See id.* at *22 n. 30.

Plaintiffs allege no facts supporting the conclusion that WOW itself acquired the contents of its users' communications *or* that it used the contents of any communications intercepted by the NebuAd technology. Thus, Plaintiffs cannot maintain a claim against WOW under ECPA.

### B. Plaintiffs Consented To Any Interception Of Their Internet Activity.

Plaintiffs' ECPA claim fails for an additional, independent reason. Because Plaintiffs continued to use WOW's Internet services after receiving notice of third party ad networks and an opportunity to opt out, they consented to any interception.

### 1. WOW Provided Plaintiffs With No Fewer than Four Forms of Notice Regarding the NebuAd Service. Plaintiffs Declined to Opt Out.

WOW's Response to Congress conclusively establishes consent. WOW notified Plaintiffs it was using a third-party ad network to provide targeted behavioral advertisements. Later, before the general deployment of the NebuAd service, WOW provided its users with *three more* forms of notice. Plaintiffs received all these forms of notice but declined to ever opt out.

*First*, from the inception of Plaintiffs' Internet services agreement with WOW, they were apprised that receipt of third-party advertising was a condition of service, that "***WOW! or someone acting on its behalf may engage in anonymous monitoring of your Internet activity***," and that they could opt out of such monitoring. (*See* Section I(E); WOW RTC, Customer Notifications Summary, at 1 (emphasis added).) *Second*, before the March deployment WOW updated its TOC to disclose that "we use an advertising network provider to deliver or facilitate

delivery of advertisements . . . *based on our Customers' anonymous surfing behavior* . . ." (*Id.* at 2 (emphasis added).)  WOW also provided a hyperlink for more details and a chance to opt out.  (*Id.* at 3.)  *Third*, still pre-deployment, WOW modified its Internet Privacy Statement to indicate that "NebuAd [would] deliver or facilitate delivery of advertisements to our users while they are surfing the web" and would "*operate[] by observing anonymous user activity across the Internet*."  (*Id.* at 2 (emphasis added).)  WOW again provided a link to opt out.  (*Id.* at 3)

*Fourth*, still before the NebuAd service was deployed, WOW added a "Third Party Advertisers" link to its website directing customers to information concerning NebuAd and the ability to opt-out, and updated its online Frequently Asked Questions ("FAQ").  (WOW RTC at 3.)  The FAQ disclosed that "non-personally identifiable information" (NPII), such as web pages viewed, cookies, search queries, ads clicked, browser settings, speed of connection, and zip code, was used by the ad network to provide tailored advertising services using information observed by the network while they browse the Internet.  (*Id.*)

Plaintiffs cannot deny that WOW provided these updates.  Plaintiffs' continued use of the WOW services after receiving notice of, and an ability to opt out of, the program amounts to consent under 18 U.S.C. § 2511(2)(d) precludes any liability under the ECPA.

> **2.      WOW's Notices and Disclosures Are Virtually Identical To Those at Issue in *Kirch, Bresnan*, and *Deering*.**

Even before WOW updated its TOS and sent its updated disclosures identifying NebuAd, its disclosures were sufficient to support a finding of consent.  The court in *Kirch* identified three factors that rendered the ISP's disclosures sufficient to support a finding of consent:  (1) disclosure of the *possibility* that data could be shared with third parties; (2) background information about targeted advertising; and (3) an opt-out mechanism.  2011 U.S. Dist. LEXIS 92701, at *28.  It specifically rejected plaintiffs' argument that more specific disclosures – such

as NebuAd's identity – were required. *Id.* at \*27-28. WOW's TOS, even before the January 2008 updates, contained the three elements found determinative in *Kirch*: (1) disclosure of possible tracking by WOW or someone acting on its behalf; (2) background information on third party ad networks and the use of persistent cookies; and (3) a link to opt out. (WOW RTC at 3.)

WOW's updated disclosures and additional notices strengthen a finding of consent. WOW's updated *Internet Terms of Service* and *Internet Privacy Information Statement*, along with the added "Third Party Advertisers" link, make the same three key representations as those made in *Mortensen* and *Deering*: the ISP or a third party ad server would collect information on how customers use the Internet, including websites they visited and search queries; it would use this information for marketing purposes, to customize Internet banner ads to products or services they were likely to be interested in; and it would provide a way for customers to opt out of the service. Like the customers in *Mortensen, Deering,* and *Kirch*, Plaintiffs were notified in multiple ways that their electronic communications would be used. They also received a direct hyperlink that would have stopped the service from using their information to customize their Internet advertising. Thousands of users opted out, but Plaintiffs did not. In short, Plaintiffs "knew that the interception was likely and agreed to the monitoring." *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004).

IV. **CONCLUSION**

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

Dated:  June 8, 2012                      Respectfully submitted,

                                        s/ Thomas A. Counts

                                        Thomas A. Counts (*Pro Hac Vice*)
                                        Bar Registration No. CA 148051
                                        PAUL HASTINGS LLP
                                        55 Second Street
                                        Twenty-Fourth Floor
                                        San Francisco, CA  94105
                                        Telephone:  (415) 856-7000
                                        Facsimile:   (415) 856-7100

                                        Counsel for Defendant
                                        WIDEOPENWEST FINANCE, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2012, I electronically filed the foregoing

MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT WIDEOPENWEST

FINANCE, LLC TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following attorneys for Plaintiffs and their e-mail addresses on file with the Court.

Michael J. Aschenbrener, Esq.
ASCHENBRENER LAW, P.C.
10 South Riverside Plaza, Suite 1800
Chicago, IL  60606
Telephone:  (312) 462-4922
Facsimile:  (312) 462-4923
Email:  mja@aschenbrenerlaw.com

Scott A. Kamber, Esq. (*pro hac vice*)
David A. Stampley, Esq. (*pro hac vice*)
Grace E. Parasmo, Esq. (*pro hac vice*)
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, NY  10005
Telephone:  (212) 920-3072
Facsimile:  (212) 920-3081
Email:  skamber@kamberlaw.com;
dstampley@kamberlaw.com;
gparasmo@kamberlaw.com

Brian Panish, Esq. (*pro hac vice*)
Rahul Ravipudi, Esq. (*pro hac vice*)
Panish, Shea & Boyle, LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, CA  90025
Telephone:  (310) 477-1700
Facsimile:  (310) 477-1699
Email:  panish@psblaw.com;
ravipudi@psblaw.com

The following non-CM/ECF participant (counsel for Plaintiffs) will be served by

United States Postal Service, Certified Mail/Return Receipt via First Class Mail, postage prepaid,

as follows:

Joseph H. Malley, Esq. (*pro hac vice*)
Law Office of Joseph H. Malley, P.C.
1045 North Zang Boulevard
Dallas, TX  72508
Telephone:  (214) 943-6100
Facsimile:  (214) 943-6170
Email:  malleylaw@gmail.com

                                   _____ s/ Thomas A. Counts _____
                                         Thomas A. Counts

                         Counsel for Defendant
                         WIDEOPENWEST FINANCE, LLC