# EXHIBIT A

**Status of Related NebuAd Cases**

| Case Name | Date Filed | Current Status of ECPA Claim | Disposition of ECPA Claim |
|---|---|---|---|
| *Kirch v. Embarq*, Case No. 10-cv-2047-JAR (D. Kan.) | 1/26/2010 | Defendant did not file motion to dismiss; court granted motion for summary judgment on 8/19/2011. *See* 2011 U.S. Dist. LEXIS 92701 (D. Kan. Aug. 19, 2011). | - "There is nothing in the record that Embarq itself acquired the contents of any communications as they flowed through its network; instead, plaintiffs' theory rests on the notion that the NebuAd System extracted the contents of the communications. Plaintiffs' assertion that Embarq 'endeavored to intercept' communications falls short of creating civil liability under the ECPA, which creates liability for actual interception." 2011 U.S. Dist. LEXIS 92701, at *21. <br> - "As numerous courts have consistently held, a defendant does not 'intercept' a communication merely by allowing or enabling, or even directing, another party to intercept communications." *Id.*, at *22. <br> - "[P]laintiffs argue that the scope of the disclosure was inadequate because NebuAd is not identified specifically as a third party with which information might be shared. Plaintiffs cite no authority requiring such specific disclosure, and fail to address the fact that the Privacy Policy expressly discloses that de-identified data and the websites a subscriber visits might be shared with third parties." *Id.*, at *27. <br> - "In sum, plaintiffs were required to agree to the terms of the Activation Agreement in order to use Embarq's Internet service; that Agreement incorporated the terms of the Privacy Policy, which informed subscribers that their de-identified data could be shared with third parties; that Agreement informed subscribers that the terms could be changed at any time through posting a new policy at Embarq's website; and Embarq modified those terms in advance of the NebuAd test to add a paragraph regarding preference advertising, with an opt-out mechanism. For these reasons, the Court joins with the Montana court in concluding that plaintiffs |

| Case Name | Date Filed | Current Status of ECPA Claim | Disposition of ECPA Claim |
|---|---|---|---|
| | | | gave or acquiesced their consent to any monitoring or interception of their Internet activity, and summary judgment is granted on this ground." *Id.*, at *28-29. |
| *Manard v. Knology, Inc.*, Case No. 10-cv-15-CDL (M.D. Ga.) | 2/02/2010 | Court granted motion to compel arbitration on 6/18/2010, *see* 2010 U.S. Dist. LEXIS 60629 (M.D. Ga. June 18, 2010), and dismissed for lack of activity on 5/2/2011. | - "Since Plaintiff and Defendant entered into a valid, enforceable agreement to arbitrate the disputes in this action, and Defendant did not waive its right to arbitration, Defendant's motion to compel arbitration is granted." 2010 U.S. Dist. LEXIS 60629, at *12. |
| *Green v. Cable One, Inc.*, Case No. 10-cv-259-RBP (N.D. Ala.) | 2/03/2010 | Court granted motion to dismiss ECPA claim on 1/12/2011. | - Defendant's motion to dismiss argued that the sole named plaintiff lacked standing because he did not have a subscription to Cable One Internet during the relative period, and plaintiff did not oppose. (Docket Nos. 54, 64.) |
| *Deering v. CenturyTel Inc.*, Case No. 10-cv-63 (D. Mont.) | 2/11/2010 | Court granted motion to dismiss ECPA claim on 5/16/2011. *See* 2011 U.S. Dist. LEXIS 51930 (D. Mont. May 16, 2011). | - "In the Court's view, there is no distinguishing difference between the 'Online Privacy Notice' and 'Online Subscriber Agreement' at issue in *Mortensen* and CenturyTel's 'Privacy Policy.' It is also very telling, and somewhat troubling, that Deering does not even mention *Mortensen*, even though the same lawyers appear to have filed very similar complaints in these cases. Accordingly, for the reasons stated in *Mortensen*, the Court concludes Deering consented to the monitoring of his Internet activity." 2011 U.S. Dist. LEXIS 51930, at *7. |
| *Mortensen v. Bresnan Commc'ns, LLC*, Case No. 10-cv-13-RFC (D. Mont.) | 2/16/2010 | Court granted motion to dismiss ECPA claim on 12/13/2010. *See* 2010 U.S. Dist. LEXIS 131419 (D. Mont. Dec. 13, 2010). | - "[I]t is evident that Plaintiffs' electronic transmissions would be monitored and would in fact be transferred to third-parties for the purposes of providing 'content or services.' Moreover, Bresnan provided Plaintiffs with specific notice of the NebuAd Appliance trial on its website. Consequently, there were at least three separate occasions where Bresnan informed Plaintiffs of its monitoring and possible transmission of Plaintiffs' electronic activities to a third- |

| Case Name | Date Filed | Current Status of ECPA Claim | Disposition of ECPA Claim |
|---|---|---|---|
| | | | party.  Lastly, Bresnan's *OnLine Subscriber Agreement* specifically states that '[p]lease read this Agreement very carefully, because by accepting the Service, you agree to all of these terms.'"  2010 U.S. Dist. LEXIS 131419, at *13. <br> - "[T]he Court concludes that through the *OnLine Subscriber Agreement,* the *Privacy Notice* and the NebuAd link on Bresnan's website, Plaintiffs did know of the interception and through their continued use of Bresnan's Internet Service, they gave or acquiesced their consent to such interception."  *Id.* |



**KATHLEEN KIRCH and TERRY KIRCH, individually, and on behalf of themselves and all others similarly situated, Plaintiffs, v. EMBARQ MANAGEMENT CO., a Delaware Corporation, and UNITED TELEPHONE COMPANY OF EASTERN KANSAS, a Delaware Corporation, and DOE DEFENDANTS 1-5, Defendants.**

**Case No. 10-2047-JAR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2011 U.S. Dist. LEXIS 92701**

**August 19, 2011, Decided**

**PRIOR HISTORY:** Valentine v. Nebuad, Inc., 2011 U.S. Dist. LEXIS 39899 (N.D. Cal., Apr. 4, 2011)

**COUNSEL:** [*1] For Kathleen Kirch, individually, and on behalf of themselves and all others similarly situated, Terry Kirch, individually, and on behalf of themselves and all others similarly situated, Plaintiffs: Brian J. Panish, Rahul Ravipudi, PRO HAC VICE, Panish, Shea & Boyle, LLP, Los Angeles, CA; David A. Stampley, Scott A. Kamber, PRO HAC VICE, Kamber Law, LLC, New York, NY; Glenn Allen Stockton, Stockton Law Office, LLC, Gardner, KS; Paul A. Traina, Steven J. Lipscomb, PRO HAC VICE, Engstrom, Lipscomb & Lack, Los Angeles, CA.

For Embarq Management Co., a Delaware Corporation, United Telephone Company of Eastern Kansas, a Delaware Corporation, Defendants: J. Emmett Logan, LEAD ATTORNEY, Daniel D. Crabtree, Mark M. Iba, Stinson Morrison Hecker LLP - Walnut, Kansas City, MO; David A. Handzo, PRO HAC VICE, Jenner & Block LLC- DC, Washington, DC.

**JUDGES:** JULIE A. ROBINSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JULIE A. ROBINSON

**OPINION**

**MEMORANDUM AND ORDER**

Kathleen and Terry Kirch filed this putative class action against Internet service providers Embarq Management Company and United Telephone Company of Eastern Kansas (collectively, "Embarq"). Plaintiffs allege common law claims for invasion of privacy and trespass to chattels, [*2] as well as claims for violation of the Computer Fraud and Abuse Act ("CFAA") and the federal Electronic Communications Privacy Act ("ECPA"). All claims relate to Embarq's collection and diversion of its customers' Internet communications to a third party Internet advertising company, NebuAd, Inc. ("NebuAd"), who used the information to target the customers with advertising. Per stipulation, plaintiffs agreed to dismiss Counts I, III and IV (invasion of privacy, CFAA and trespass to chattels).[1] Before the Court are two motions: plaintiffs' Motion to Certify Class (Doc. 31) and defendants' Motion for Summary Judgment (Doc. 59) seeking to dismiss the remaining ECPA claim. Oral argument was held July 15, 2011, at which time the Court took the motions under advisement. After considering the parties' arguments and submissions, the Court is ready to rule. For the reasons set forth in detail below, the Court grants defendants' Motion for Summary

2011 U.S. Dist. LEXIS 92701, *2

Judgment and denies plaintiffs' Motion to Certify Class as moot.[2]

2    Doc. 60, Ex. 1.

2    The Complaint also names Doe Defendants 1-5, who are identified as "entities associated with Embarq and/or UTC, possibly with contractual obligations with Defendants, [*3] that may require Defendants to provide notice to the Does of this matter so as to appear and represent their interests. When the identities of any Does who are sued as Does are identified, Plaintiffs will amend their complaint to name such parties." Although a plaintiff may generally plead claims against unknown defendants, he must "provide [] an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served." *Fisher v. Okla. Dep't of Corr. Unknown State Actor and/or Actors*, 213 F. App'x 704, 708 n.2 (10th Cir. 2007) (quoting *Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996)). Here, the Complaint does not allege with any specificity which claims involve the Doe defendants or what roles those unknown individuals might have played in this matter, nor have plaintiffs moved to amend the Complaint to name such parties. Because all other claims against Embarq are dismissed below, the Court dismisses these Doe defendants as well.

## I. Procedural Background

In November, 2008, plaintiffs Kathleen and Terry Kirch, as well as others, brought suit in the Northern District of California against NebuAd, Embarq, and several other Internet service [*4] providers ("ISPs"), alleging violations of the ECPA.[3] Embarq moved to dismiss on multiple grounds, and the California court dismissed the complaint against Embarq and the other ISPs for lack of personal jurisdiction. Plaintiffs refiled against Embarq in the District of Kansas; other plaintiffs refiled against other ISPs in Montana, Alabama, Georgia, and Illinois, using common counsel in Los Angeles. Plaintiffs continue to pursue their case against NebuAd in California.

3    *Valentine et al. v. NebuAd Inc., et al.*, No. 3:08-cv-05113 (N.D. Cal.).

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[4] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

4    Fed. R. Civ. P. 56(a).

5    *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

6    *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) [*5] (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

7    *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

8    *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

9    *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find [*6] for the nonmovant."[12] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13] Rule 56(c)(4) provides that opposing affidavits must be

made on personal knowledge and shall set forth such facts as would be admissible in evidence.[14] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[15]"

10  *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

11  *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

12  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

13  *Adams*, 233 F.3d at 1246.

14  Fed. R. Civ. P. 56(c)(4).

15  *Id.; Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every [*7] action."[16] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

16  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)(quoting Fed. R. Civ. P. 1).

17  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

### III. Uncontroverted Facts

Consistent with the well-established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to the nonmoving party. The Court notes that the majority of the facts set forth by Embarq are either undisputed, or that plaintiffs claim to lack information to dispute the facts asserted. With respect to the latter, however, plaintiffs do not assert that relief is appropriate under Fed. R. Civ. P. 56(d), and because Rule 56(e) requires a plaintiff to properly address another party's assertion of fact as required by Rule 56(c), the

Court thus considers such facts as undisputed.[18]

18  Fed. R. Civ. P. 56; D. Kan. Rule 56.1(e) (requiring responding party to specifically set forth in detail the reasons why they cannot admit or deny a [*8] fact).

United Telephone Company of Eastern Kansas ("UTC") is, among other things, an ISP that provides high-speed Internet services to subscribers in Kansas. At all relevant times, UTC did business under the brand name "Embarq." Embarq Management Company ("EMC") is a corporate affiliate of UTC and provides contracted products, services, and employees to UTC and other CenturyLink subsidiaries. EMC provides no services to the public and has no customer-facing operations.

### NebuAd's Role

NebuAd is a company headquartered in California that operated as an online advertising company. NebuAd contracted with a number of ISPs to allow it to install its Ultra-Transparent Appliance ("UTA") on the ISPs' networks. NebuAd sought to deliver advertisements targeted to the interests of individuals who used the ISPs' networks, based on interest profiles constructed by NebuAd's UTA and associated server computers ("the NebuAd System"). The NebuAd System built interest profiles based on information concerning certain websites that users visited.

In November 2007, on behalf of UTC, EMC entered into a Technology Trial Evaluation Agreement with NebuAd to test the UTA. Company personnel performed laboratory tests [*9] and determined that routing Internet traffic through the UTA did not affect network integrity or performance. After laboratory testing was complete, it was decided to allow NebuAd to field test the UTA in a "live" environment. UTC's Gardner, Kansas point of presence was selected for the test ("the NebuAd test") because it was the smallest point of presence, with approximately 26,000 high-speed Internet subscribers, and it was proximate to qualified technical and product development staff. EMC does not own the network facilities on which the NebuAd equipment was installed; rather, those network facilities are owned and operated by UTC. The NebuAd test began in mid-December 2007 and was stopped completely by the end of March 2008. Embarq received $29,143 from NebuAd as compensation for the NebuAd test.

Plaintiffs' experts admitted that NebuAd's UTA did not degrade the performance of any customer's Internet service, and plaintiffs have stipulated that NebuAd's UTA caused no damage to any Embarq customer's computer. The NebuAd System did not serve pop-up advertisements. The System did not increase the number of advertisements served to a user, but rather, served advertisements only in place [*10] of the advertisements that otherwise would have been served to the user. The System was authorized by other advertising networks to replace their advertisements with its own.

All Internet traffic that passed through UTC's Gardner point of presence flowed through NebuAd's UTA. NebuAd's UTA identified the "port number" associated with each internet communication passing through UTC's Gardner point of presence. Different port numbers are associated with different types of Internet communications. Port 80 is associated with "HTTP traffic," and only websites whose addresses begin with "http://" are accessed through Port 80. An IP address is a series of numbers associated with a server or website, and it is used to route traffic to the proper destination on the Internet. The NebuAd System employed a technology called "deep packet inspection" ("DPI") to identify the URL requested by a user. A URL, which stands for "Uniform Resource Locator," is the address of a page on the world wide web. URLs specify the host server name, directory, and file name of the Web page that a user seeks to visit.

The NebuAd System also used DPI to access cookies sent to and from advertising networks, as well as the [*11] URL of the "referer" page, *i.e.*, the web page received by the user's computer immediately prior to its request for a new page. A cookie is a piece of text, usually encrypted, that is sent to a user's computer by a website. When the user later returns to the website, the website recognizes the cookie and thus is able to track a user's behavior over time. Cookies are regularly used on the Internet to store site preferences, retain a user's shopping cart contents, or, in the case of advertising networks, allow the advertising network to recognize the same user across a wide array of different websites. The advertising network cookies observed by the NebuAd system were typically encrypted, meaning they would have appeared as a long string of numbers and letters that were unreadable, so the NebuAd System did not extract any information from them.

The NebuAd System used the long string of numbers and letters constituting an advertising network cookie to help create an anonymized identification number it assigned to each user's computer. The System created a profile linked to the anonymized identification number. Profiles were associated with a user's computer solely through the anonymized [*12] identifier number that the NebuAd System had assigned. NebuAd designed its System with the intention that it would not have been possible to "reverse engineer" its anonymized identifier numbers and identify the actual users associated with them. There is no evidence that anyone ever attempted or succeeded in identifying any actual users associated with the identifier numbers or the profiles created by the NebuAd System. A profile stored information concerning what the NebuAd System had inferred to be a user's market interests, based upon the URLs it obtained. When the NebuAd System saw a URL that had previously been identified as reflecting a certain market interest, the computers in the NebuAd System converted the URL into a code signifying a market interest and then deleted the raw data. The NebuAd System then created or updated a profile to reflect the market interests it observed. The process of converting a URL into a code signifying a market interest and then deleting the raw data likely took microseconds, and no more than a minute. The process of extracting URLs, converting them to predefined market interests, and updating user profiles was entirely automated and involved no [*13] human intervention. The targeted advertisements that the NebuAd System served were based upon the de-identified profiles it had constructed.

### Embarq's Role

NebuAd remotely configured the UTA to make the device operable. Thereafter, the NebuAd System collected information, created de-identified user profiles and served ads. Plaintiffs' expert, Alissa Cooper, testified that her understanding of Embarq's role with respect to the NebuAd System as the ISP was that Embarq "furnished the connection to the NebuAd equipment, so, it essentially connected its users to the UTA, and it connected the UTA to the rest of its networks." Cooper testified that there was no other involvement by the ISP, other than it was paid, and that Embarq did not serve any advertisements based upon the user profiles developed by the NebuAd System. Cooper further testified that Embarq did not have access to the data collected or the user profiles developed by the NebuAd System, and that any

access Embarq had to the raw data was access that any ISP ordinarily has to raw data that flows through the ISP's network.[19]

19  Doc. 60, Ex. 6.

### Consent/Privacy Policy

As a condition of the High-Speed Internet Activation Customer Agreement [*14] ("Activation Agreement"), Embarq subscribers were required to agree to the terms of Embarq's Privacy Policy.[20] The Activation Agreement states that

> EMBARQ'S network gathers information about Internet usage such as the sites visited, session lengths, bit rates, and number of messages and bytes passes. EMBARQ uses this information in the aggregate. EMBARQ may share this aggregated information with other parties from time to time. EMBARQ also collects and uses personally identifiable information obtained from you and from other sources for billing purposes, to provide and change service, to anticipate and resolve problems with your service, or to identify, create and inform you of products and services that better meet your needs. Except as otherwise provided in this Section, EMBARQ will not use or disclose any of your personally identifiable information unless compelled by a court order or subpoena, you consent to the use of disclosure, or to protect its broadband services and facilities. . . . EMBARQ's provision of Services to you is also subject to EMBARQ's broadband privacy policies, which are found at http://www.embarq.com/legal/privacy.html /broadbandservices and are hereby incorporated [*15] by reference.[21]

20  Doc. 60, Ex. 2-A.
21  Id.

The Activation Agreement informed subscribers that "EMBARQ may revise, modify or discontinue any or all aspects of the Services, including but not limited to . . .

any terms of this Agreement, upon posting of the new terms on the EMBARQ website at www.EMBARQ.com." The Activation Agreement states that it "is a legally binding contract that should be read in its entirety," and instructs customers to click on the "accept" button if they agree with each and every term set forth in the Activation Agreement.[22]

22  Id.

Embarq's Privacy Policy, effective November 2007, informed subscribers that "[d]e-identified data also might be purchased by or shared with a third party." The Privacy Policy further states that Embarq could disclose to third party business partners "customer proprietary network information," ("CPNI"), which is defined to include "the websites you visit," to enable business partners to assist in providing Embarq's service. The Privacy Policy also states that "EMBARQ does not disclose CPNI and other nonpublic personal information (such as credit card numbers), without your consent or direction, except to business partners involved in providing [*16] EMBARQ service to customers or as required or permitted by law." Subscribers were also notified that the Privacy Policy could be updated periodically to reflect changing practices, specifically that "[i]f at any point we decide to use personally identifiable information in a manner that is materially different from what was stated at the time it was collected, we will notify you via posting on this page for 30 days before the material change is made and give you an opportunity to opt out of the proposed use at any time."

Prior to the NebuAd test, Embarq added to the section of its Privacy Policy concerning "USE OF PERSONAL INFORMATION" a paragraph entitled, **"Preference Advertising"** that stated:

> Embarq may use information such as the websites you visit or online searches that you conduct to deliver or facilitate the delivery of targeted advertisements. The delivery of these advertisements will be based on anonymous surfing behavior and will not include users' names, email addresses, telephone numbers, or any other Personally Identifiable Information.
>
> You may choose to opt out of this preference advertising service. By opting out, you will continue to receive

advertisements as normal; but [*17] these advertisements will be less relevant and less useful to you. If you would like to opt out, click here. (embarq.com/adsoptions)

Although all traffic, including that of customers who opted out, flowed through the UTA, by clicking on the "opt out" link in the Privacy Policy, a subscriber could ensure that the NebuAd System would not create a profile of that subscriber and would not serve any targeted advertisements to that subscriber. Plaintiffs did not opt out of the Preference Advertising service. Kathleen Kirch testified that she does not recall reviewing Embarq's Privacy Policy and that she did not make a practice of reviewing privacy policies of any Internet service she signed up for or websites that she visited. Instead, she just clicked "I agree," and continued on to the site. Kirch further testified that she understood that when she did so, she was bound by the terms of the policy.[23]

    23   Doc. 60 at Ex. 10.

## IV. Discussion

    Plaintiffs, representing a putative class, allege that for a period exceeding ninety days in 2008, Embarq, as an ISP, collected and diverted approximately 26,000 of its Gardner, Kansas customers' internet communications to NebuAd, a third-party internet advertising [*18] company, who used the information to target the customers with advertisements. Plaintiffs allege Embarq's actions constitute a violation of Title II of the ECPA, which Act amended the Wiretap Act, 18 U.S.C. § 2510 *et seq.* 18 U.S.C. § 2511(1)(a) provides for criminal penalties where a person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," as well as where one person "intentionally discloses" to another, or "intentionally uses or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the interception of a[n] electronic communication." By contrast, the civil liability provision set forth in 18 U.S.C. § 2520 states that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation."

    Embarq argues that it cannot be held civilly liable

under the ECPA because § 2520(a) does not provide for liability of aiders and abettors and that [*19] Embarq itself did not intercept plaintiffs' electronic communications in violation of the ECPA. Alternatively, Embarq argues that even if it had intercepted an electronic communication, plaintiffs consented to the interception and use of their electronic communications. The Court addresses each issue in turn.

## A. Secondary Liability

    Plaintiffs argue that the NebuAd System violated the ECPA because it intercepted or acquired the "contents" of Embarq's customers' Internet communications. Highly simplified, plaintiffs assert that "the UTA intercepted and analyzed *all* of the traffic that passed through it." Embarq counters that the UTA merely identified the port number of a communication and the URLs acquired by the NebuAd System were functionally no different from a telephone number acquired by a pen register; it is merely the address of the webpage requested by the user, not the webpage itself, and thus is a "means of establishing communication."[24] The Court need not resolve this issue, however, because even assuming plaintiffs' position is correct, Embarq cannot be held secondarily liable for having aided and abetted NebuAd's alleged interception.

    24   *See New York Tele. Co.*, 434 U.S. at 167.

    Plaintiffs [*20] argue that Embarq intercepted communications by routing them to NebuAd's UTA. The term "intercept" is specifically defined by the ECPA to mean the "acquisition of the contents" of a communication."[25] "Contents" is defined to mean "the substance, purport, or meaning of that communication."[26] Although the term "acquisition" is not defined by the statute, "to acquire" commonly means "to come into possession, control, or power of disposal."[27] Thus, it follows that in order to "intercept" a communication, one must come into possession or control of the substance, purport, or meaning of that communication. The Court agrees with Embarq that regardless of what information the NebuAd System extracted from the communications traversing through the UTA, it is undisputed that Embarq had no access to that information or to the profiles constructed from that information.[28] As plaintiffs' expert testified, Embarq's role was to install the NebuAd device so as to furnish the UTA connection to NebuAd. In other words, the NebuAd device, or "box," goes into place, then all of the raw data that flows through Embarq is directed to that device, where NebuAd does the analysis

and, apparently, separates out [*21] the Port 80 traffic. Moreover, plaintiffs cite no authority that Embarq's access to the raw data that flowed through its network constitutes a violation of the ECPA, which requires an entity to actually acquire the contents of those communications. There is nothing in the record that Embarq itself acquired the contents of any communications as they flowed through its network; instead, plaintiffs' theory rests on the notion that the NebuAd System extracted the contents of the communications. Plaintiffs' assertion that Embarq "endeavored to intercept" communications falls short of creating civil liability under the ECPA, which creates liability for actual interception.

25   18 U.S.C. § 2510(4).
26   18 U.S.C. § 2510(8).
27   WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 18-19 (1986).
28   Incredibly, at oral argument, plaintiffs' counsel went so far as to claim that Embarq employees reviewed the raw data and transported information of their choosing to NebuAd. Plaintiffs do not cite, nor could the Court locate, anything in the record to support this assertion, which is contradicted by testimony of plaintiffs' experts.

In an apparent effort to avoid this result, plaintiffs seek to hold Embarq [*22] secondarily liable based upon its contractual relationship with NebuAd, emphasizing that Embarq licensed the UTA owned by NebuAd and allowed NebuAd to access its network. Plaintiffs, in effect, seek to hold Embarq indirectly liable as a procurer, aider, abettor, or co-conspirator of NebuAd's alleged violation of the ECPA. The civil liability provision of the ECPA, however, does not provide for secondary liability, as liability attaches only to the party that actually intercepted a communication.[29] As numerous courts have consistently held, a defendant does not "intercept" a communication merely by allowing or enabling, or even directing, another party to intercept communications.[30] For example, in *In re Toys R Us, Inc., Privacy Litigation*,[31] plaintiffs sought to hold Toys R Us liable under the Wiretap Act for permitting a third party, Coremetrics, to load "Web bugs" onto the computers of visitors to Toys R Us' website.[32] Coremetrics was in the business of tracking Internet users' buying and websurfing habits, and its device enabled it to "monitor, intercept, transmit, and record all aspects of a Webuser's

private activity when they access Toys R Us' Webpages or other Webpages."[33] The [*23] district court granted Toys R Us' motion to dismiss plaintiffs' Wiretap Act claim, holding that the "plain language of § 2520(a) now limits its applicability to those who 'intercept,' 'disclose,' or 'use' the communications at issue" and that Toys R Us could not be held liable because there was no allegation that Toys R Us itself intercepted any communications.[34] Such is the case here, and plaintiffs cite no authority to the contrary.

29   18 U.S.C. § 2520.
30   *See, e.g., Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1005-06 (9th Cir. 2006) (rejecting the argument that "a person or entity who aids and abets or who enters into a conspiracy is someone or something that is 'engaged' in a violation."); *Doe v. GTE Corp.*, 347 F.3d 655, 658 (7th Cir. 2003) ("[N]othing in the statute condemns assistants, as opposed to those who directly perpetrate the act."); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168-69 (5th Cir. 2000) (same); *Reynolds v. Spears*, 93 F.3d 428, 432-33 (8th Cir. 1996); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001); *Perkins-Carrillo v. Systemax, Inc.*, No. 03-2836, 2006 U.S. Dist. LEXIS 39894, 2006 WL 1553957 (N.D. Ga. May 26, 2006); *In re Toys R Us, Inc., Privacy Litig.*, No. 00-2746, 2001 U.S. Dist. LEXIS 16947, 2001 WL 34517252, at *6-7 (N.D. Cal. Oct. 9, 2001).
31   2001 U.S. Dist. LEXIS 16947, 2001 WL 34517252.
32   2001 U.S. Dist. LEXIS 16947, [WL] at *6-7.
33   2001 U.S. Dist. LEXIS 16947, [WL] at *1.
34   2001 U.S. Dist. LEXIS 16947, [WL] at *6-7.

Because [*24] the record shows that Embarq did not acquire any of the information obtained by the NebuAd System, under the plain language of the ECPA, Embarq did not itself intercept any communications and cannot be held secondarily liable. Accordingly, Embarq is entitled to summary judgment on this ground.

**B. Consent**

Embarq is also independently entitled to summary judgment based on plaintiffs' consent, which is expressly excluded from the category of "unlawful interceptions."[35] In two other cases brought by plaintiffs' law firm arising out of NebuAd System tests conducted in Montana, the

district court dismissed the ECPA count based on similar language contained in the ISPs' privacy policies.[36] In those cases, the court considered the Terms of Service documents of the ISPs, and found that the plaintiff Internet subscribers were put on notice of the NebuAd monitoring via the defendant ISPs' updates to those terms.[37] As the court explained, because that document indicated that "[u]se of [the ISP's] Internet access services was expressly subject to the [Terms of Service]" and the plaintiff continued to use the Internet, he was bound by the changes to the agreement and impliedly consented to the monitoring [*25] of his Internet activity.[38] Likewise, the Court finds that in this case plaintiffs consented to the use by third parties of their de-identified web-browsing behavior when they accessed the Internet under the terms of Embarq's Privacy Policy, incorporated by reference into its Activation Agreement.

35   18 U.S.C. § 2511(2)(d) (no liability "where one of the parties to the communication has given prior consent to such interception.").

36   *See Deering v. CenturyTel, Inc.*, No. 10-63-BLG-RFC, 2011 U.S. Dist. LEXIS 51930, 2011 WL 1842859 (D. Mont. May 16, 2011); *Mortensen v. Bresnan Commc'n, L.L.C.*, No. 10-13-BLG-RFC, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454 (D. Mont. Dec. 13, 2010). A similar motion to dismiss on consent grounds is pending in yet another NebuAd case filed in Illinois, *Valentine v. Wideopen West Fin., LLC*, Case No. 09-cv-7653, 2010 U.S. Dist. LEXIS 90566 (N.D. Ill.).

37   *See Deering*, 2011 U.S. Dist. LEXIS 51930, 2011 WL 1842859, at *1-3, *Mortensen*, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, at *4-5.

38   *Deering*, 2011 U.S. Dist. LEXIS 51930, 2011 WL 1842859, at *1-3.

Embarq's Activation Agreement informed subscribers that "EMBARQ may revise, modify or discontinue any or all aspects of the Services, including but not limited to . . . any terms of this Agreement, upon posting of the new terms on the EMBARQ website at www.EMBARQ.com." Plaintiffs do not [*26] dispute that, in advance of the NebuAd test, Embarq posted a new paragraph in its Privacy Policy entitled "Preference Advertising," in which it informed subscribers that "Embarq may use information such as the websites you visit or online searches that you conduct to deliver or facilitate the delivery of targeted advertisements. The

delivery of these advertisements will be based on anonymous surfing behavior." Subscribers were then offered the opportunity to opt out by clicking on a hypertext link. Moreover, a pre-existing paragraph in the Privacy Policy informed subscribers that "[d]e-identified data might be purchased by or shared with a third party." The pre-existing Privacy Policy also explained that Embarq would automatically "log the websites you visit," and that such information, which constitutes CPNI, could be shared with "business partners involved in providing EMBARQ service to customers." Thus, as with the Montana cases, plaintiffs consented to monitoring by using Embarq's Internet service after notice, and that notice and consent defeats their ECPA claim.

Nevertheless, plaintiffs assert several reasons why their use of Embarq's Internet service did not constitute consent [*27] to the NebuAd test. The Court will briefly address these arguments, which are without merit. First, plaintiffs argue that the scope of the disclosure was inadequate because NebuAd is not identified specifically as a third party with which information might be shared. Plaintiffs cite no authority requiring such specific disclosure, and fail to address the fact that the Privacy Policy expressly discloses that de-identified data and the websites a subscriber visits might be shared with third parties. While it is true that NebuAd was identified specifically in one of the cases,[39] the Montana court did not appear to make such a distinction, instead focusing on the fact that the terms of the agreements and privacy policies in those cases existed and were in effect before the NebuAd test, and also mentioned third parties generally.[40] Second, plaintiffs' argument that the notice was not conspicuous enough is belied by their admission that the prevailing industry practice among websites is to disclose their relationship with advertising networks and the type of information those networks collect, in their privacy policies. Plaintiffs cite no authority that such method of disclosure is inadequate, [*28] and the Montana case decisions dismissing on the ground of consent hold to the contrary.[41] Finally, plaintiffs' argument that the opt-out mechanism was insufficient because it did not prevent the NebuAd System's collection of data does not negate their consent because they did not attempt to opt out. Plaintiffs do not dispute that the opt-out mechanism was effective in that, by opting out, subscribers did not receive any targeted advertising.

39   2011 U.S. Dist. LEXIS 51930, [WL] at *2.

40   2011 U.S. Dist. LEXIS 51930, [WL] at *2-3; *Mortensen*, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, at *5.

41   *Id.*

In sum, plaintiffs were required to agree to the terms of the Activation Agreement in order to use Embarq's Internet service; that Agreement incorporated the terms of the Privacy Policy, which informed subscribers that their de-identified data could be shared with third parties; that Agreement informed subscribers that the terms could be changed at any time through posting a new policy at Embarq's website; and Embarq modified those terms in advance of the NebuAd test to add a paragraph regarding preference advertising, with an opt-out mechanism. For these reasons, the Court joins with the Montana court in concluding that plaintiffs gave or acquiesced their consent to any monitoring [*29] or interception of their Internet activity, and summary judgment is granted on this ground.[42]

42   Because the Court grants summary judgment on secondary liability and consent grounds, it does not reach the issue of Embarq's alternative "ordinary course of business" defense. The Court notes that this defense also appears to have merit, as plaintiffs have admitted that Embarq conducted the NebuAd test to further legitimate business purposes and that behavioral advertising is a widespread business and is commonplace on the Internet.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion for 18 U.S.C. § 2510(4) requires an interception must take place "through the use of any electronic, mechanical, or other device"; that phrase is defined to exclude "any device or apparatus which can be used to intercept a[n] . . . electronic communication" that is "being used by a provider of wire or electronic communication device in the ordinary course of business." *Id.* § 2510(5)(a)(ii). Summary Judgment (Doc. 59) is GRANTED;

**IT IS FURTHER ORDERED** that plaintiffs' Motion to Certify Class (Doc. 31) is DENIED as moot.

**IT IS SO ORDERED**.

Dated: August 19, 2011

/s/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES [*30] DISTRICT JUDGE



**ANDREW PAUL MANARD, individually, and on behalf of himself and all others similarly situated, Plaintiff, vs. KNOLOGY, INC., a Delaware Corporation, Defendant.**

**CASE NO. 4:10-CV-15 (CDL)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA, COLUMBUS DIVISION**

**2010 U.S. Dist. LEXIS 60629**

**June 18, 2010, Decided**
**June 18, 2010, Filed**

**COUNSEL:** [*1] For Andrew Paul Manard, Individually, and on behalf of himself and all others similarly situated, Plaintiff: Brian Panish, Rahul Ravipudi, LEAD ATTORNEYS, PRO HAC VICE, LOS ANGELES, CA; David Andrew Stampley, Scott Adam Kamber, LEAD ATTORNEYS, PRO HAC VICE, NEW YORK, NY; Joseph Hanson Malley, LEAD ATTORNEY, PRO HAC VICE, DALLAS, TX; Russell T. Deutschman, LEAD ATTORNEY, DULUTH, GA.

For Knology Inc, a Delaware Corporation, Defendant: L Norton Cutler, Michael Alex Sink, LEAD ATTORNEYS, PRO HAC VICE, DENVER, CO; Thomas J Gallo, LEAD ATTORNEY, Cheralynn M. Gregoire, ATLANTA, GA; Jere F. White, Jr., Birmingham, AL; Marcus Benton Calhoun, Jr., Thomas F. Gristina, William L. Tucker, Columbus, GA.

**JUDGES:** CLAY D. LAND, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CLAY D. LAND

**OPINION**

**ORDER**

In this putative class action, Plaintiff Andrew Paul Manard alleges that Defendant Knology, Inc. diverted substantially all of the Internet communications of approximately 20,000 of its customers, without their consent, to an advertising company, which then reviewed the intercepted information and profiled Defendant's affected customers. Plaintiff, individually and on behalf of a class of similarly situated individuals, brings claims against [*2] Defendant for violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. He also asserts state law claims for invasion of privacy, unjust enrichment, and trespass.

Defendant contends that Plaintiff's claims are subject to binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and filed a Motion to Compel Arbitration and Stay Proceedings (Doc. 15). For the following reasons, Defendant's motion is granted.

FACTUAL BACKGROUND

Defendant is an Internet service provider for residential and commercial customers. Plaintiff is the account holder for Precision Chiropractic, which entered into a business services agreement with Defendant on February 19, 2008 (the "BSA"). (*See generally* Ex. A to Def.'s Mot. to Compel Arbitration & Stay Proceedings

[hereinafter Def.'s Mot.], Business Services Agreement, Feb. 19, 2008.) By signing the BSA, Plaintiff and Precision Chiropractic "acknowledge[d] notice of, accept[ed] and agree[d] to the **Knology Customer Service Agreement, Acceptable Use Policy**, and **Cable Television Privacy Rights Notice**, copies of which [were] posted at www.knology.com, and [*3] policies and regulations which may be referenced therein, all of which [were] incorporated herein by reference and made a part hereof." (*Id*. at 2.)

The Knology Customer Service Agreement ("CSA") in effect at the time Plaintiff signed the BSA with Defendant contained an arbitration provision that provided in part:

> **IT IS IMPORTANT THAT YOU READ THIS SECTION CAREFULLY. IT PROVIDES FOR RESOLUTION OF DISPUTES (WHETHER BASED IN CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION OR ANY OTHER LEGAL OR EQUITABLE THEORY), THROUGH FINAL AND BINDING ARBITRATION BEFORE A SINGLE NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION**. ALL DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT (OTHER THAN ACTIONS FOR THE COLLECTION OF DEBTS YOU OWE US), INCLUDING, WITHOUT LIMITATION, ANY DISPUTE BASED ON ANY SERVICE OR ADVERTISING OF THE SERVICE RELATED THERETO, SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION, WHICH SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), 9 U.S.C. §[§] 1-16. ANY QUESTION REGARDING WHETHER A PARTICULAR CONTROVERSY, OR THE PROCEDURES THEREIN, IS SUBJECT TO ARBITRATION SHALL BE DECIDED BY THE ARBITRATOR. YOU HAVE THE RIGHT TO BE REPRESENTED [*4] BY COUNSEL IN THE ARBITRATION.

(Ex. B to Def.'s Mot., Knology Customer Service Agreement 14, Dec. 12, 2007.) Plaintiff acknowledges that he signed the BSA and that the BSA "incorporate[d] by reference Knology's Customer Service Agreement." (Pl.'s Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. to Compel Arbitration & Stay Proceedings 4-5 [hereinafter Pl.'s Opp'n].) Plaintiff, however, argues that the arbitration provision is not binding on him because Defendant did not physically provide him with the CSA at the time he entered into the BSA. (*Id*. at 5.)

DISCUSSION

**I. The Federal Arbitration Act**

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate disputes arising out of a transaction involving interstate commerce is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA,

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to [*5] arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

A strong federal policy exists in favor of arbitration, and "[a]bsent some violation of public policy, a federal court must refer to arbitration any controversies covered by the provisions of an arbitration clause." *Telecom Italia, SpA v. Wholesale Telecom Corp*., 248 F.3d 1109, 1114 (11th Cir. 2001). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1311 (11th Cir. 2005) (per curiam) (internal

quotation marks omitted). The Court may not, however, compel parties to arbitrate a dispute if they have not agreed to do so. *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). Although the validity of an arbitration agreement is generally governed by the FAA, the issue of whether an enforceable agreement to arbitrate exists is typically determined by state law contract principles. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367-68 (11th Cir. 2005). [*6] "Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts[,]" along with the strong federal policy favoring arbitration. *Id.* at 1368.

In this case, Plaintiff contends that Defendant's motion to compel arbitration and to stay proceedings should be denied because (1) Defendant failed to provide evidence that the parties agreed to arbitrate; (2) the arbitration provision is too broad and therefore unenforceable under Georgia law; and (3) Defendant waived its right to arbitrate the disputes in this action. [1] (Pl.'s Opp'n 2.) The Court will address each contention in turn.

> 1   Plaintiff does not appear to argue that his claims are not covered under the arbitration provision, and the Court is satisfied that they are.

## II. The Existence of a Valid Agreement to Arbitrate

Initially, Plaintiff contends that he did not assent to an agreement to arbitrate. (Pl.'s Opp'n 4-6.) Whether the parties have a valid arbitration agreement must be decided by the Court. *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992). In making that determination, the Court applies Georgia law. *Caley*, 428 F.3d at 1368. [*7] (Knology Customer Service Agreement 16 (stating CSA is "governed by and construed in accordance with the laws of the State of Georgia").)

Here, Plaintiff signed the contract with Defendant that clearly and unambiguously incorporated the arbitration provision. That arbitration provision was readily available for Plaintiff's review if he had bothered to read it. (*See* Ex. B to Def.'s Reply in Supp. of Mot. to Arbitrate, Hemker Decl. PP 3-4, June 1, 2010 (noting that the CSA was available on Defendant's website for Plaintiff's review on the date Plaintiff executed the BSA).) Under Georgia law, "incorporation by reference is

generally effective to accomplish its intended purpose where . . . the provision to which reference is made has a reasonably clear and ascertainable meaning." *Binswanger Glass Co. v. Beers Constr. Co.*, 141 Ga. App. 715, 717, 234 S.E.2d 363, 365 (1977); *accord J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 215 (5th Cir. 1973); [2] *see World Rentals & Sales, LLC v. Volvo Constr. Equip. Rents, Inc.*, 517 F.3d 1240, 1245 (11th Cir. 2008) ("It is clear . . . that an arbitration clause can be incorporated even if the relevant incorporation language does not [*8] specifically refer to it."); *c.f. Rushing v. Gold Kist, Inc.*, 256 Ga. App. 115, 118-19, 567 S.E.2d 384, 387-88 (2002) (finding that arbitration provision in agricultural cooperative's by-laws was enforceable against member even though member only signed membership agreement and not by-laws, because membership agreement expressly provided that his membership was subject to by-laws and member "expressly consented to be bound by the [b]y-[l]aws" when he executed membership agreement). By signing the BSA, which incorporated by reference the arbitration provision in the CSA, Plaintiff agreed to arbitrate the dispute in this case.

> 2   In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

## III. Enforcement Under the FAA

Next, Plaintiff contends that even if he entered into a valid agreement to arbitrate, the arbitration provision is too broad and is, therefore, unenforceable under Georgia law. (Pl.'s Opp'n 6-9.) Plaintiff argues that the transactions between Plaintiff and Defendant [*9] did not "involve[] interstate commerce in any way." (*Id.* at 8.) The Court rejects this contention. It is clear that the transactions in this case--provision of telecommunications services, including telephone and internet--involve interstate commerce. *See United States v. Faris*, 583 F.3d 756, 759 (11th Cir. 2009) (per curiam) ("The internet is an instrumentality of interstate commerce." (internal quotation marks omitted)); *United States v. Evans*, 476 F.3d 1176, 1180 (11th Cir. 2007) ("Telephones and cellular telephones are instrumentalities of interstate commerce."). Therefore, the FAA governs the agreement in this case. Furthermore, the FAA

"preempts state law to the extent it treats arbitration agreements differently than other contracts." *Caley*, 428 F.3d at 1367. Under the FAA, arbitration agreements, however broad in the types of disputes they cover, are enforceable. *See, e.g., Blinco*, 400 F.3d at 1311. (*See also* Pl.'s Opp'n 8 (acknowledging that broad arbitration provisions such as the agreement in this case are valid under federal cases interpreting the FAA).) Therefore, the Court finds that the arbitration provision in this case is enforceable under the FAA.

**IV. Lack of Waiver**

Finally, [*10] Plaintiff contends that Defendant "has taken actions inconsistent with any such [arbitration] agreement," and that "[i]n so doing, Kn[o]logy waived its right to arbitrate this dispute." (Pl.'s Opp'n 9.) Specifically, Plaintiff argues that Defendant's decisions to file a motion to dismiss, negotiate a scheduling order, and participate in a mediation were actions "plainly inconsistent with Knology's perceived right to arbitrate this matter." (*Id.* at 10.)

"[D]espite the strong policy in favor of arbitration, a party may, by its conduct, waive its right to arbitration." *S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (citation omitted). In determining whether Defendant has waived its right to arbitrate, the Court looks to two factors: "First, [the Court] decide[s] if, under the totality of the circumstances, the party has acted inconsistently with the arbitration right, and, second, [the Court] look[s] to see whether, by doing so, that party has in some way prejudiced the other party." *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315-16 (11th Cir. 2002) (internal quotation marks omitted); *see S & H Contractors, Inc.*, 906 F.2d at 1514 ("[A] party [*11] that [s]ubstantially invok[es] the litigation machinery prior to demanding arbitration may waive its right to arbitrate." (second & third alterations in original) (internal quotation marks omitted)). "When determining whether the other party has been prejudiced, [the Court] may consider the length of delay in demanding arbitration and the expense incurred by that party from participating in the litigation process." *S & H Contractors, Inc.*, 906 F.2d at 1514.

Defendant's actions in this case were neither inconsistent with its right to arbitrate, nor prejudicial to Plaintiff. Although Defendant previously filed a motion to dismiss, that action alone does not require a finding

that it waived its right to insist upon arbitration. *See generally Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457 (2d Cir. 1985) (holding defendant did not waive right to arbitrate by filing motion to dismiss); *see also Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, No. 7:07-cv-077 (HL), 2008 U.S. Dist. LEXIS 59701, 2008 WL 2967230, at *4-*5 (M.D. Ga. July 30, 2008) (same). Defendant's participation in mediation is likewise not inconsistent with pursuing its right to have the matter arbitrated if it could [*12] not be resolved by agreement. Finally, Plaintiff has not suffered prejudice by Defendant's limited litigation of this case. Plaintiff filed his Class Action Complaint with this Court on February 2, 2010, and the parties began settlement discussions. The mediation occurred on April 15, 2010, and only when the mediation yielded unsuccessful results did Defendant file its motion to compel arbitration. For all of these reasons, the Court finds that Defendant did not waive its right to arbitrate.

Since Plaintiff and Defendant entered into a valid, enforceable agreement to arbitrate the disputes in this action, and Defendant did not waive its right to arbitration, Defendant's motion to compel arbitration is granted. This action is stayed until the parties arbitrate the disputes in this action. [3] 9 U.S.C. § 3.

> [3] Although not raised by Plaintiff, the Court notes that the arbitration agreement is ambiguous as to whether class arbitration is permitted. (*See* Knology Customer Service Agreement 15 ("DISPUTES UNDER TH[E] [CSA] MAY NOT BE JOINED WITH ANOTHER PROCEEDING, INCLUDING ANY INDIVIDUAL OR CLASS LAWSUIT.").) The arbitrator must decide as a matter of contract interpretation under Georgia law [*13] whether class arbitration is permitted by the arbitration agreement. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452-53, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003) (plurality opinion).

CONCLUSION

As discussed above, Defendant Knology, Inc.'s Motion to Compel Arbitration and Stay Proceedings (Doc. 15) is granted, and this action is stayed pending resolution of the arbitration. [4]

> [4] Defendant's Motion to Dismiss (Doc. 9) is

2010 U.S. Dist. LEXIS 60629, *13

moot given the Court's Order to arbitrate this action.

IT IS SO ORDERED, this 18th day of June, 2010.

/s/ Clay D. Land

CLAY D. LAND

UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN  DIVISION**

SAMUEL GREEN, etc.

      Plaintiff,

v.                                          CV 10-PT-259-E

CABLE ONE, INC.

      Defendant.

## ORDER

On January 12, 2011, defendant Cable One, Inc. filed a motion to dismiss this action for

lack of subject matter jurisdiction because plaintiff Samuel Green lacked standing.  DKT. ## 54,

55.

On February 8, 2011, plaintiff submitted a notice of non-opposition to defendant's motion

to dismiss.  DKT. #64.

Accordingly, it is this 23rd  day of February, 2011, hereby

**DONE** and **ORDERED** that the defendant's motion to dismiss is **GRANTED**, and this

action is hereby **DISMISSED** with each party to bear their own costs and fees.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**



**NEIL DEERING, Individually and on behalf of himself and all others similarly situated, Plaintiff, -vs- CENTURYTEL, INC., a Louisiana Corporation, CENTURYTEL BROADBAND SERVICES, LLC, a Louisiana Corporation, and CENTURYTEL SERVICE GROUP, LLC, a Louisiana Corporation, Defendants.**

**CV-10-63-BLG-RFC**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION**

**2011 U.S. Dist. LEXIS 51930**

**May 16, 2011, Decided**
**May 16, 2011, Filed**

**COUNSEL:** [*1] For Neil Deering, individually, and on behalf of himself and all others similarly situated, Plaintiff: Lane K. Bennett, BENNETT LAW OFFICE, Kalispell, MT; Rahul Ravipudi, PRO HAC VICE, PANISH SHEA & BOYLE, Los Angeles, CA; Scott A. Kamber, PRO HAC VICE, KAMBERLAW, New York, NY.

For Centurytel Inc, a Louisiana Corporation, Centurytel Broadband Services, LLC, a Louisiana Corporation, Centurytel Service Group, LLC, a Louisiana Corporation, Defendants: Alan Lynn Joscelyn, LEAD ATTORNEY, GOUGH SHANAHAN JOHNSON & WATERMAN Helena, MT; David A. Handzo, LEAD ATTORNEY, PRO HAC VICE, JENNER & BLOCK, Washington, DC.

**JUDGES:** Richard F. Cebull, United States District Judge.

**OPINION BY:** Richard F. Cebull

**OPINION**

**ORDER GRANTING MOTION TO DISMISS COUNTS I AND II**

**I. INTRODUCTION**

Neil Deering filed this putative class action against Internet service providers Century Tel, Inc., CenturyTel Broadband Services, LLC, and CenturyTel Service Group, LLC (collectively, "CenturyTel"). Deering alleges common law claims for invasion of privacy by intrusion upon seclusion (Count I) and trespass to chattels (Count IV), as well as claims for violation of the federal Electronic Communications Privacy Act ("ECPA") (Count II) and Computer Fraud and Abuse [*2] Act ("CFAA") (Count III). All claims relate to CenturyTel's collection and diversion of its customers' Internet communications to a third party, who used the information to target the customers with advertisements. Pending before the Court is CenturyTel's motion to dismiss the invasion of privacy and ECPA claims. CenturyTel argues its customers consented to the collection and diversion of their Internet communications and therefore these claims necessarily fail. As this Court noted in *Mortensen v. Bresnan Communications*, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454 (D.Mont. 2010), consent is a defense to ECPA and invasion of privacy claims. Since Deering acquiesced his consent by using CenturyTel's services knowing his Internet activity could be diverted and used to target him with advertisements, the motion must be granted.

## II. BACKGROUND

As alleged in the complaint, CenturyTel is an Internet Service Provider ("ISP") that provides customers in Kalispell, Montana with Internet access. In late 2007 or early 2008, CenturyTel entered into an agreement with NebuAd, a provider of "tailored advertising services." Under the agreement, CenturyTel agreed to divert its customers Internet communications to NebuAd in exchange [*3] for a share of NebuAd's advertising revenue. CenturyTel's share was based upon the number of subscriber accounts per month that were diverted to NebuAd. The diversion of Internet communications was accomplished by the installation of NebuAd's "Ultra-Transparent Appliance" into CenturyTel's network. NebuAd then used this information to target them with advertisements. The Appliance was removed in June of 2008.

Use of CenturyTel's Internet access services was expressly subject to the "CenturyTel Privacy Policy for Internet Access Services." *Doc. 33-1.* [1] The Privacy Policy dated October 31, 2007 advised customers to "READ THIS PRIVACY POLICY IN FULL BEFORE USING THE SERVICES" because "BY SUBSCRIBING TO ONE OR MORE OF OUR SERVICES, YOU AGREE TO CENTURYTEL'S COLLECTION AND USE OF YOUR PERSONAL INFORMATION AS DESCRIBED IN THIS PRIVACY POLICY." *Id. at p.1.* Under the heading "COLLECTION OF DATA," CenturyTel customers were notified that "personal information collected may include, without limitation, name, address, telephone number, personal computer specifications, e-mail address, user IDs and passwords, billing and transaction information, credit card information, and contact preferences." [*4] *Id.*

> 1 Although the Privacy Policy was not attached to the Complaint, the Complaint made specific reference to the inadequate notice provided by the Privacy Policy. Complaint, ¶¶ 52-56. Where the plaintiff makes such a reference, the defendant may offer the document and the court may treat the document as part of the complaint for purposes of a Rule 12(b)(6) motion. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Under the heading, "SHARING OF DATA," customers were informed that CenturyTel "may disclose your personal information to companies and vendors that perform marketing or other services on our behalf." *Id.*

Similarly, under the heading "HOW WE USE THE DATA WE COLLECT," CenturyTel notified its customers that it "uses personal information to better understand your needs and interests, and to provide you with a better service experience ... [and] [t]his may include customizing your shopping experiences ... and providing information regarding goods and services that we believe may be of particular interest to you." *Id.*

The Privacy Policy also contained a paragraph titled "Cookies and Web Beacons" informing customers that "CenturyTel may collect information about your computer [*5] hardware and software--for example, your IP address, domain name, and access times--using 'cookies.' Cookies are files that Web browsers place on the computer of a Web site visitor, and that identify you as a unique user." *Id. at 2.* This section also stated that CenturyTel "or a third party acting on our behalf, may use cookies to tailor and improve the content we deliver to CenturyTel's family of Web sites, to improve our Web site(s) by assessing which areas, features, and products are most popular, and to personalize our Web site(s) and make recommendations based on information, including product choices, a particular visitor has provided." *Id.*

Most importantly, CenturyTel also provided notice of the NebuAd agreement. Specifically, an email to its subscribers was sent informing them that the Privacy Policy had been updated and providing a link to the updated Privacy Policy. Under the heading, "Online Advertising and Third Party Ad Servers," CenturyTel customers were notified that "CenturyTel partners with a third party to deliver or facilitate delivery of advertisements to our users while they are surfing the web. This delivery of advertisements may be facilitated by the serving of [*6] ad tags outside the publisher's existing HTML code. These advertisements will be based on those users anonymous surfing behavior while they are online." *Id. at 5.* CenturyTel customers were further notified of their right to opt out of receiving targeted advertisements by clicking on an imbedded link. The "Online Advertising and Third Party Ad Servers" section also contained a link to NebuAd's website.

## III. ANALYSIS

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Analogous to the arguments made by the defendant ISP in *Mortensen*, CenturyTel argues that by using CenturyTel's services despite the disclosures made in the Privacy Policy, Deering and the putative class members consented to the interception and use of their electronic communications. 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, *3-6. As this Court noted [*7] in *Mortensen*, consent is a defense to the EPCA. 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, *3, *citing* 18 U.S.C. § 2511(2)(d). Further, an essential element of the tort of intrusion upon seclusion is that the plaintiff have an objectively reasonable expectation of privacy and there is no reasonable expectation of privacy when a plaintiff has been notified that his Internet activity may be forwarded to a third party to target him with advertisements. *Mortensen*, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, *5-6.

In the Court's view, there is no distinguishing difference between the "Online Privacy Notice" and "Online Subscriber Agreement" at issue in *Mortensen* and CenturyTel's "Privacy Policy." It is also very telling, and somewhat troubling, that Deering does not even mention *Mortensen*, even though the same lawyers appear to have filed very similar complaints in these cases. Accordingly, for the reasons stated in *Mortensen*, the Court concludes Deering consented to the monitoring of his Internet activity. Counts I and II must therefore be dismissed.

## IV. ORDER

For those reasons, **IT IS HEREBY ORDERED** that CenturyTel's Partial Motion to Dismiss Counts I and II of Plaintiff's Complaint (*doc. 32*) is **GRANTED.**

Dated this 16th day of May, 2011.

*/s/ Richard F. Cebull* [*8]

Richard F. Cebull

United States District Judge



DALE MORTENSEN and MELISSA BECKER, individually, and on behalf of themselves and all others similarly situated, Plaintiffs, vs. BRESNAN COMMUNICATION, Defendant.

CV 10-13-BLG-RFC

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION

2010 U.S. Dist. LEXIS 131419

December 13, 2010, Decided
December 13, 2010, Filed

**PRIOR HISTORY:** Mortensen v. Bresnan Commun., L.L.C., 2010 U.S. Dist. LEXIS 120603 (D. Mont., Nov. 15, 2010)

**COUNSEL:** [*1] For Dale Mortensen, individually, and on behalf of themselves and all others similarly situated, Melissa Becker, individually, and on behalf of themselves and all others similarly situated, Plaintiffs: Gregory Paul Johnson, LEAD ATTORNEY, JOHNSON LAW OFFICE, Billings, MT; David A. Stampley, Scott A. Kamber, KAMBERLAW, New York, NY.

For Bresnan Communications, a Delaware Corporation, Defendant: W. Scott Mitchell, LEAD ATTORNEY, HOLLAND & HART, Billings, MT; Adam S. Caldwell, John D. Seiver, PRO HAC VICE, DAVIS WRIGHT TREMAINE, Washington, DC.

**JUDGES:** RICHARD F. CEBULL, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RICHARD F. CEBULL

**OPINION**

**ORDER**

Presently before the Court is Defendant Bresnan Communications, LLC's ("Bresnan)" Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Doc. 10.* In bringing the motion, Bresnan contends that Plaintiffs present claims fail to state a claim upon which relief may be granted (1) under the Electronic Communications Privacy Act ("ECPA"); (2) under Computer Fraud and Abuse Act ("CFAA"); (3) for invasion of privacy; and (4) for trespass to chattel. Plaintiffs oppose the motion.

**BACKGROUND**

This is a class action suit. Plaintiffs, representing a putative class, allege that from early 2008 [*2] through June of 2008, Defendant Bresnan Communications, as an Internet Service Provider ("ISP"), diverted substantially all of Plaintiffs' Internet communications to NebuAd, Inc., a third-party Internet advertising company. Plaintiffs allege that Bresnan allowed NebuAd to install its "Appliance" onto Bresnan's network. Plaintiffs further allege that NebuAd used this Appliance to gather information to create profiles of Bresnan's customers in order to target them with preference-sensitive advertisement. In addition, Plaintiffs allege that Bresnan profited from the alleged invasion.

Plaintiffs contend that these activities were not in Bresnan's regular course of business as an ISP and were

not to protect Bresnan or its customers. Moreover, Plaintiffs contend Bresnan never obtained the consent of its customers to perform this action. As such, Plaintiffs allege the following causes of action (1) violations of the Electronic Communications Privacy Act ("ECPA"); (2) violations of the Computer Fraud and Abuse Act ("CFAA"); (3) invasion of privacy; (4) unjust enrichment; and (5) trespass to chattel.

## STANDARD OF REVIEW

A Rule 12(b)(6) dismissal may be based on either a "lack of a cognizable legal [*3] theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir.2008). In other words, the plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." *Johnson*, 534 F.3d at 1122. "Specific facts are not necessary; the statement need only give the defendant [s] fair notice of what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007).

Every complaint must, at a minimum, plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Weber v. Dept. of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir.2008). Facts which are alleged in the complaint are presumed true, and the Court must construe them and draw all reasonable inferences from them in favor of the plaintiff. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.1996).

Nevertheless, and in spite of the deference the Court is bound to pay to any factual allegations made, it is not proper for the Court to assume that "the [plaintiff] can prove facts which [he [*4] or she] has not alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983). Nor must the Court "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or those which are "merely conclusory," require "unwarranted deductions" or "unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001) (*amended on other grounds*, 275 F.3d 1187 (9th Cir.2001)); *see also Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003) (court need not accept as true unreasonable inferences or conclusions of law cast in

the form of factual allegations).

## DISCUSSION

Bresnan seeks dismissal of Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6).

### A. *Electronic Communications Privacy Act ("ECPA")*

Bresnan seeks dismissal of Plaintiffs' claim under the ECPA (also known as Wiretap Act) that it violated the ECPA's prohibition on intercepting, endeavoring to intercept and/or procuring interceptions (by NebuAd) of electronic communications as well as using and/or endeavoring to use electronic communications. 18 U.S.C. §§ 2511(1)(a) &2511(1)(d).

### 1. *Bresnan did not "intercept" an electronic* [*5] *communication*

Bresnan contends that it cannot be "liable for another's interception or use of electronic communications." [1] Specifically, Bresnan cites cases wherein liability under the ECPA cannot attach where a defendant acquiesces, has passive knowledge of, or instructs another to intercept or use electronic communications. *Reynolds v. Spears*, 93 F.3d 428, 432-33 (9th Cir. 1996); *Perkins-Carrillo v. Systemax*, 2006 U.S. Dist. LEXIS 39894, 2006 WL 1553957, *15 (N.D.Ga. 2006). In *Spears*, the Eighth Circuit Court found that the wife of a co-defendant was not liable under the ECPA just because she was aware, acquiesced and had passive knowledge of her husband's unlawful interceptions. *Spears*, 93 F.3d at 433. In *Systemax*, the district court found that the ECPA attaches only to the individual or entity that engaged in the violation of interception, disclosure and intentional use and not to one that instructs the interception. *Id.*, 2006 U.S. Dist. LEXIS 39894, 2006 WL 1553957 at 15.

> [1]  *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11) at p. 17.*

Bresnan goes on to cite numerous other cases across the country to support its contention that it was nothing more than a passive conduit for NebuAd's interception of Plaintiffs' personal information. [*6] However, Plaintiffs have alleged in their Complaint that Bresnan allowed NebuAd to install its device ("Appliance") on Bresnan's network. Further, but for that Appliance, NebuAd would have been unable to access Plaintiffs' personal electronic

transmissions.

Title I of the ECPA, the Wiretap Act makes it an offense to "intentionally intercept [ ] ... any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Ninth Circuit's interpretation of the word "intercept" also comports with the ordinary meaning of the word, which is "to stop, seize, or interrupt in progress or course before arrival." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002)(*quoting Webster's Ninth New Collegiate Dictionary* 630 (1985)).

Here, the Class Action Complaint alleges that NebuAd and Bresnan deployed the Appliance on Bresnan's network infrastructure and configured its network to "funnel all User Internet through the Appliance." [2] Further, the Complaint alleges that Bresnan maintained the Appliance and directed the flow of Plaintiffs' Internet traffic through the Appliance. [3]

> 2    *CLASS ACTION COMPLAINT (Doc. #1)*, ¶ 20.
> 3    Id., at ¶ 21.

Based on this, Plaintiffs have pled sufficient facts [*7] to establish, for purposes of a 12(b)(6) motion to dismiss, that Bresnan intercepted Plaintiffs' electronic communications in violation of the ECPA. Bresnan's Motion to Dismiss on this ground is DENIED.

### 2. *Plaintiffs consented to the interception*

In the alternative, Bresnan argues that Plaintiffs agreed to the interception when they agreed to the terms of using Bresnan's Internet service and thus consented to all acts alleged in the Class Action Complaint.

An intentional interception of a telephone conversation is not actionable if a party to the conversation gives prior consent to the interception. 18 U.S.C. § 2511(2)(d). "In the Title III milieu as in other settings, consent inheres where a person's behavior manifests acquiescence or a comparable diminution of his or her otherwise protected rights." *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir.1990). A court can infer implied consent when the circumstances indicate that the party knowingly agreed to the surveillance. *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987). Consent need not be explicit, but may be implied from "actual notice" of the interception. *Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999)

Bresnan [*8] argues that even if it had intercepted an electronic communication, Plaintiffs had consented to the interception in the *Bresnan Communications OnLine Privacy Notice* and in Bresnan's *OnLine Subscriber Agreement.* [4] A review of these documents informs Bresnan's customers that they agree to allow Bresnan and its agents to monitor electronic postings and transmissions as well as use equipment to collect information on Plaintiffs' Internet usage. [5] Specifically, Defendant Bresnan's *Online Privacy Notice* informed the Plaintiffs that when using Bresnan's Service,

> the Service equipment automatically collects information on your use of the Service including information on the choices that you make along the range of services offered, the programs and web sites you review or services you order, the time that you actually use the Service or view the programs and web sites, other information about your 'electronic browsing,' and the text of e-mail or other electronic communications you send or receive using any of these services.
>
> * * *
>
> In addition, when you use the Service or any Internet service, certain information relating to your use of these services may be disclosed to third parties that provide [*9] content or services. Such disclosure may include, without limitation, information on the choices that you make along the range of services offered, including the content, programs and web sites you view or services you order on the Service or on the Internet, the time that you actually use the services or view the content and web sites, and other information about your "electronic browsing."
>
> * * *
>
> From time to time, Bresnan Communications may engage reliable third parties to provide, license or sublicense goods or services . . . to its subscribers. . . Such third parties may collect and generate information

concerning customers or subscribers in the course of providing services to them.

Bresnan Communications will provide such third parties with subscriber information necessary to provide the Third-Party Services and may grant to such third parties the right to access and use such subscriber information for billing, support, network monitoring and planning, and to otherwise fulfill such third party's obligations to Bresnan Communications and/or the Service and their respective subscribers. [6]

4    *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibits C & D, respectively.*
5    Id.
6    *DEFENDANT'S* [*10] *BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibit C*

In Bresnan's *OnLine Subscriber Agreement*, Bresnan informed its customers regarding,

(g.) **Monitoring of Postings and Transmissions.** Bresnan Communications shall have no obligation to monitor postings or transmissions made in connection with the Service. However, Customer acknowledges and agrees that Bresnan Communications and its agents shall have the right to monitor any such postings and transmissions, including without limitation email, newsgroups, chat, IP audio and video, and web space content, from time to time and to disclose them in accordance with the terms of this Agreement, applicable law or government request. [7]

7    *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibit D*

Finally, Bresnan contends that it gave Plaintiffs specific notice of when the NebuAd Appliance trial would commence and provided a link for its customers to

opt out of the NebuAd Appliance if they so chose. [8]

8    *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibit E.*

Significantly, Plaintiffs do not contest that they agreed, by way of Bresnan's *Privacy Notice* and *Subscriber Agreement*, to the interception. Rather, Plaintiffs [*11] argue Bresnan construed their consent too broadly and that Bresnan "cavalierly" implied the Plaintiffs' consent. *Watkins v. Berry*, 704 F.2d 577, 581 (11th Cir. 1983). According to Plaintiffs, they were not aware of the monitoring and therefore could not consent in fact. Plaintiffs contend that Bresnan did not obtain meaningful consent for the interception in that it did not fully describe its intent to funnel "customer's complete, unfiltered Internet traffic to a third-party processor for profiling and ad-serving." [9] Finally, Plaintiffs note Bresnan could have explained the privacy protections and revenue benefits at issue as well as obtaining opt-in consent prior to commencement of the NebuAd Appliance trial.

9    *PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (Doc. #23) at 14.*

"Without actual notice, consent can only be implied when the surrounding circumstances convincingly show that the party knew about and consented to the interception." *Berry v. Funk*, 146 F.3d 1003, 1011, 331 U.S. App. D.C. 62 (D.C.Cir.1998). In other words, someone who makes calls despite knowledge that they are being intercepted is considered to have consented to the interception. *U.S. v. Van Poyck*, 77 F.3d 285, 292 (9th Cir. 1996). [*12] The *Griggs-Ryan* Court noted that,

implied consent is "consent in fact" which is inferred "from the surrounding circumstances indicating that they knowingly agreed to the surveillance." Thus, implied consent-or the absence of it-may be deduced from the circumstances prevailing" in a given situation. The circumstances relevant to an implication of consent will vary from case to case, but the compendium will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private.

*Id.*, 904 F.2d at 116-117.

Bresnan contends that it gave Plaintiffs specific notice of when the NebuAd Appliance trial would commence. Bresnan further contends that it provided a link for its customers to opt out of the NebuAd Appliance if they so chose. *United States v. Van Poyck*, 77 F.3d 285, 292 (9th Cir.1996); *United States v. Staves*, 383 F.3d 977, 981 (9th Cir.2004). Here, it appears that circumstances "indicate that [the] party to the communication knew that interception was likely and agreed to the monitoring." *Staves*, 383 F.3d at 981.

This Court finds Plaintiffs' argument to be without merit. As noted [*13] in Bresnan's *Privacy Notice* and *OnLine Subscriber Agreement*, it is evident that Plaintiffs' electronic transmissions would be monitored and would in fact be transferred to third-parties for the purposes of providing "content or services." [10] Moreover, Bresnan provided Plaintiffs with specific notice of the NebuAd Appliance trial on its website. Consequently, there were at least three separate occasions where Bresnan informed Plaintiffs of its monitoring and possible transmission of Plaintiffs' electronic activities to a third-party. Lastly, Bresnan's *OnLine Subscriber Agreement* specifically states that "[p]lease read this Agreement very carefully, because by accepting the Service, you agree to all of these terms." [11]

[10]    *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibit C.*
[11]    *DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS (Doc. #11), Exhibit D.*

For those reasons, the Court concludes that through the *OnLine Subscriber Agreement*, the *Privacy Notice* and the NebuAd link on Brenan's website, Plaintiffs did know of the interception and through their continued use of Bresnan's Internet Service, they gave or acquiesced their consent to such interception. *In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 514 (S.D.N.Y.2001).

Accordingly, [*14] Bresnan's Motion to Dismiss the Plaintiffs' ECPA claim is GRANTED.

**B.** *Invasion of Privacy*

Next, Bresnan seeks dismissal of Plaintiffs' common-law tort claim of invasion of privacy. Plaintiffs allege that by monitoring and transmitting Plaintiffs' electronic communication, Bresnan wrongful intruded into Plaintiffs' "private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Deserly v. Department of Corrections*, 2000 MT 42, 298 Mont. 328, 335, 995 P.2d 972 (2000) (*citing Sistok v. Northwestern Tel. Sys. Inc.*, 189 Mont. 82, 92, 615 P.2d 176 (1980)). Plaintiffs are alleging the invasion of privacy category of "intrusion upon seclusion." To prevail on the tort of intrusion upon seclusion, a plaintiff must show: (a) an actual, subjective expectation of seclusion or solitude, and (b) that the expectation was objectively reasonable. *Medical Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806 (9th Cir.2002). A review of the Class Action Complaint adequately reflects Plaintiffs' subjective expectation of seclusion.

However, as noted earlier, the *Subscriber Agreement* and the *Privacy Notice* informed the Plaintiffs of the monitoring of their electronic communications [*15] and activities through the use of Bresnan's Internet service and network. Those documents further informed Plaintiffs of the potential that their electronic transmissions may be provided to a third-party for purposes of providing content or services. In addition, Plaintiffs were informed that the use of Bresnan's Service constituted acceptance of the terms of the *Subscriber Agreement* and *Privacy Notice*.

Under these facts, Plaintiffs cannot demonstrate that their expectation of privacy was objectively reasonable. *Miller v. Great Falls Athletic Club, LLC*, 2010 MT 171N, 2010 WL 3122633 at 2 (Mont. 2010); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir.2004) (stating that individuals may not reasonably expect privacy in transmissions over the internet). Regardless of any subjective expectation of privacy, given Plaintiffs' notice of the monitoring and potential forwarding of their electronic activities to a third-party, they did not have an objectively reasonable expectation of privacy. In addition, Plaintiffs were given specific notice of the NebuAd Appliance trial and were given an opportunity to opt out if they chose. [12] *United States v. Heckenkamp*, 482 F.3d 1142, 1147 (9th Cir. 2007) ("privacy [*16] expectations may be reduced if the user is advised that information transmitted through the network is not confidential and that the systems administrators may monitor communications transmitted by the user").

12  Bresnan argues, with some merit, that it is the intrusion onto the privacy that gives rise to the cause of action of invasion of privacy and not the subsequent disclosure of the private information. *Browning v. AT&T Corp.*, 682 F.Supp.2d 832 (N.D. Ill. 2009). Here, the crux of Plaintiffs' claims are that their injuries arise not from the interception of their electronic communications, but the disclosure of said communications to a third-party.

Further, Plaintiffs, by using Bresnan's Internet service, consented to Bresnan's monitor and use of Plaintiffs' electronic communications. *State v. Brubaker*, 184 Mont. 294, 301, 602 P.2d 974 (1979) (although discussing the heightened constitutional right to privacy, the Montana Supreme Court stated that once a person voluntarily consents to an invasion, his constitutional right to privacy disappears). For the foregoing reasons, this Court concludes that Plaintiffs have failed to meet the objective prong of intrusion upon seclusion. Bresnan's Motion to [*17] Dismiss on Plaintiffs' invasion of privacy claim is therefore GRANTED.

### C. *Computer Fraud and Abuse Act*

Next, Bresnan seeks dismissal of Plaintiffs' claim that it violated the Computer Fraud and Abuse Act ("CFAA") when it accessed Plaintiffs' computers without authorization and caused Plaintiffs to suffer damages/loss.

The CFAA prohibits any person from intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtain information from any protected computer. 18 U.S.C. § 1030(a)(2)(C). The CFAA also prohibits any person from intentionally accessing a protected computer without authorization, and as a result of such conduct, causing damage and loss. 18 U.S.C. §§ 1030(a)(5)(B)& (C). The CFAA defines "exceeds authorized access" as "access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to so obtain or alter." 18 U.S.C.§ 1030(e)(6); *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132-33 (9th Cir.2009) (discussing "authorization" under the CFAA). Although a criminal statute, 18 U.S.C. § 1030(g) [*18] allows for right of action for private persons injured under the CFAA.

Thus, to bring a claim under 18 U.S.C. §1030(a),

Plaintiffs must show that Bresnan: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and (3) thereby obtained or altered information (4) from any protected computer and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value. *Id., LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

### 1. *Damage and Loss*

Bresnan argues that dismissal of Plaintiffs' CFAA claim is appropriate because, other than conclusory allegations that mirror the CFAA statute, Plaintiffs have failed to allege any specific damages or loss in excess of $5,000.

The CFAA defines "damage" as "any impairment to the integrity or availability of data, a system, or information." 18 U.S.C. § 1030(e)(8). Under the CFAA, "loss" is treated differently from "damage," and is defined as: "[a]ny reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue [*19] lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Accordingly, Plaintiffs must claim economic loss or damages in an amount "aggregating at least $5,000 in value during any 1-year period to one or more individuals." See 18 U.S.C. § 1030(e)(8)(A).

Insofar as Plaintiffs allege they suffered emotional distress due to Bresnan's invasion of their privacy, trespass to chattel, and any misappropriation of confidential data, their injuries are not actionable because only economic losses are recoverable under the CFAA. *Letscher v. Swiss Bank Corp*, 1996 U.S. Dist. LEXIS 4908, 1996 WL 183019, at *2 (S.D.N.Y. 1996); *see also S. Rep No. 101-544* (1990) ("Damages [under § 1030(e)(8) (A) ] are limited to economic damages, except for violations of the medical records section, when pain and suffering damages would be permitted.")

Here, Plaintiffs contend they have suffered loss and damages that exceed $5,000. Specifically, they argue that Bresnan allowed the NebuAd Appliance to disable and alter Plaintiffs' security features on their computers in order to place its "cookies" to track Plaintiffs' Internet activities. Further, Plaintiffs contend they were forced [*20] to mitigate Bresnan's invasive actions by expending

time, money and resources to investigate and repair their personal computer's diminished performance.

In opposition to Bresnan's dismissal motion, Plaintiffs rely on *In re Toys R Us, Inc., Privacy Litigation*, 2001 U.S. Dist. LEXIS 16947, 2001 WL 34517252 (N.D.Cal. 2001). In that case, that court found that plaintiffs had met the $5,000 loss requirement under the CFAA because defendants caused identical cookies to be placed on plaintiff's computers, unbeknownst to them. Contrary to Bresnan's argument, these identical files or "cookies" implanted on each of plaintiff's computers resulting in damages of a uniform nature. *Id.* As such, the *Toys R Us* court found that plaintiffs could aggregate their damages and therefore had sufficiently pled the existence of a single act resulting in damages exceeding $5,000 during any one-year period to one or more individuals. *Id.*, 2001 U.S. Dist. LEXIS 16947, 2001 WL 34517252 at 11; *see also In re Apple & AT & TM Antitrust Litigation*, 596 F.Supp.2d 1288, 1308 (N.D.Cal. 2008).

It is evident in review of the case law, that damages and loss under the CFAA focuses on the Bresnan's act of distribution of the "cookie" or in this instance, Bresnan's single act of installing [*21] and distributing the NebuAd Appliance. Given that the NebuAd Appliance was distributed to all Plaintiffs, for purposes of a 12(b)(6) motion, Plaintiffs' allegations of the above-stated damages, when aggregated across "one or more individuals" is sufficient to survive a dismissal motion. *Id.* Bresnan's Motion to Dismiss on this Ground is therefore DENIED.

## 2.*Authorization*

Plaintiffs have alleged that Bresnan, in violation of the CFAA, intentionally placed the NebuAd Appliance and its "cookies" on Plaintiffs' computers. The "cookies" allegedly allowed NebuAd, through the Bresnan, to retrieve data from Plaintiffs' computers. Plaintiffs allege that Bresnan placed the cookies on the computers and retrieved the data for the purpose of monitoring Plaintiffs' web activity. In response, Bresnan contends that Plaintiffs, through their use of its Internet service, consented and authorized Bresnan's access to Plaintiffs' computers.

"[A] person uses a computer 'without authorization' under § 1030(a)(2) and (4) when the person has not received permission to use the computer for any purpose

(such as when a hacker accesses someone's computer without any permission), or when the employer has rescinded permission [*22] to access the computer and the defendant uses the computer anyway." *LVRC Holdings*, 581 F.3d at 1135.

The Court, as stated above, has concluded that Plaintiffs' use of Bresnan's Internet service constituted acceptance of the terms of Bresnan's *Privacy Notice* and *OnLine Subscriber Agreement*. The terms of those agreements reflect that Plaintiffs consented and authorized Bresnan's monitoring of Plaintiffs' electronic communications and activities. Further, by use of Bresnan's Internet service, Plaintiffs were informed of the potential that their electronic transmissions may be provided to a third-party for purposes of providing content or services. As such, for purposes of the CFAA, this Court concludes that Bresnan did not access Plaintiff's computers "without authorization."

The next issue is whether Bresnan has "exceeded authorization." Here, Plaintiffs argue that the NebuAd Appliance, which Bresnan allowed to access Plaintiffs' computers, altered the character of Plaintiffs' computers' privacy and security control protocols.

A reading of Bresnan's *Privacy Notice* and *OnLine Subscriber Agreement* as well as the NebuAd Appliance trial weblink provide no notice to Plaintiffs that their computer [*23] settings were to be actively altered or tampered with by Bresnan. To the extent Bresnan argues that it was NebuAd that exceeded the authorized access, Plaintiffs' allegations are sufficient to presume that Bresnan acted in concert with NebuAd by installing the Appliance onto its network. These present allegations run contrary to Bresnan's argument that its actions are nothing more than that of a passive party that monitors and provides Plaintiffs' electronic information to a third-party for purposes of providing services or content. For purposes of a 12(b)(6) motion, Plaintiffs have sufficiently alleged that Bresnan's act of tampering with the security and privacy protocols exceeded any authorization that Plaintiffs may have given. Bresnan's Motion to Dismiss Plaintiffs' CFAA claim is DENIED.

## D.*Trespass to Chattel*

Finally, Bresnan seeks dismissal of Plaintiffs' claim of trespass to chattel. This Court notes that Montana case law has limited recognition, if at all, of this common-law tort claim. As such, this Court must look to other states.

Trespass to chattels "lies where an intentional interference with the possession of personal property has proximately cause injury." *Thrifty-Tel v. Bezenek*, 46 Cal. App. 4th 1559, 54 Cal.Rptr.2d 468 (1996). [*24] In order to prevail on a claim for trespass based on accessing a computer system, the plaintiff must establish: (1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in damage to plaintiff. *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1069 (N.D.Cal. 2000); *See Thrifty-Tel*, 46 Cal. App. 4th 1559, 54 Cal.Rptr.2d 468.

In the instant case, it is undisputed that Plaintiffs' personal computers are private property. By way of agreements with Bresnan and use of Bresnan's ISP, Plaintiffs have granted Bresnan conditional access for purposes of monitoring Plaintiffs' electronic transmissions as well as placing "cookies" on Plaintiffs' computers for purposes of tracking web activity. However, like Plaintiffs' CFAA claim, Bresnan's alleged actions of altering the privacy and security controls on Plaintiffs' computers activity is sufficiently outside of the scope of the use permitted by Plaintiffs. As such, for purposes of a 12(b)(6) motion, Plaintiffs have sufficiently

alleged that Bresnan intentionally interfered with the possession of their personal property. Bresnan's Motion to [*25] Dismiss Plaintiffs' trespass to chattel claim is DENIED.

## CONCLUSION

As reflected above, Bresnan's Motion to Dismiss Plaintiffs' claim under the Electronic Communications Privacy Act ("ECPA") is GRANTED. Bresnan's Motion to Dismiss Plaintiffs' claim for invasion of privacy is GRANTED. Bresnan's Motion to Dismiss Plaintiffs' claim under Computer Fraud and Abuse Act ("CFAA") is DENIED. Bresnan's Motion to Dismiss Plaintiffs' claim for trespass to chattels is DENIED.

For the foregoing reasons, IT IS HEREBY ORDERED that Bresnan's Motion to Dismiss (*Doc. 10*) is GRANTED IN PART and DENIED IN PART.

DATED this 13th day of December, 2010.

*/s/ Richard F. Cebull*

RICHARD F. CEBULL

UNITED STATES. DISTRICT JUDGE